CHERYL HAXBY BOVARA, Indiv. and as Adm'r of the Estate of Albert Bovara, Deceased, *et al.,* Plaintiffs-Appellants, v. ST. FRANCIS HOSPITAL *et al.,* Defendants-Appellees.

First District (4th Division)   No. 1—97—2972

Opinion filed August 20, 1998.

Power, Rogers & Smith, P.C., of Chicago (Joseph A. Power, Jr., and Devon C. Bruce, of counsel), for appellants.

Wildman, Harrold, Allen & Dixon, of Chicago (Helaine W. Heydemann and John T. Benz, of counsel), for appellees.

PRESIDING JUSTICE CERDA delivered the opinion of the court:
Plaintiffs, Cheryl Haxby Bovara, individually and as administrator of the estate of Albert Bovara, deceased; Jennifer Bovara; Jamie Bovara; and Jonathan Bovara, appeal from the entry of summary judgment by the circuit court of Cook County in favor of defendants Roy C. Bliley, M.D., and Joseph W. Edgett, M.D.

At issue is whether a physician-patient relationship was formed between Drs. Bliley and Edgett and the plaintiffs' decedent and/or whether these two defendants owed a duty of care to Albert Bovara. On request of defendant Luke R. Pascale, M.D., who was Bovara's examining cardiologist, Drs. Bliley and Edgett reviewed Bovara's angiogram film and communicated to Dr. Pascale that Bovara was a candidate for coronary angioplasty. While defendant Dominick J. Allocco, M.D., performed the angioplasty procedure, Bovara died.

We reverse and remand on the basis that there was a genuine issue of material fact as to whether Drs. Bliley and Edgett acted as Bovara's physicians and owed a duty of care to Bovara.

Plaintiffs' first amended complaint brought suit against St. Francis Hospital; Cardiovascular Renal Consultants, S.C.; Dr. Pascale; Dr. Bliley; Dr. Edgett; and Dr. Allocco. All the physician defendants allegedly were agents and/or employees of both the hospital and Cardiovascular Renal Consultants S.C., a corporation (CRC), at the relevant times. Plaintiffs alleged that Albert Bovara died as a result of the angioplasty and that Drs. Bliley and Edgett were negligent in part for failing to adequately recognize the risks to Bovara of an angioplasty. Affidavits of physicians were attached to the complaint swearing that Bovara's arterial lesion was not the type on which angioplasty should have been performed.

On December 18, 1996, Drs. Bliley and Edgett filed a motion for summary judgment, arguing in part that no physician-patient relationship arose between them and Bovara prior to the time that they assisted in attempting to resuscitate Bovara during angioplasty.

## FACTS

The following facts were established from the depositions and affidavits filed in connection with the motion for summary judgment.

At St. Francis Hospital, Albert Bovara met with Dr. Luke R. Pascale, who was a cardiologist at St. Francis Hospital and CRC, concerning his heart disease; two of his arteries were blocked. Dr. Pascale took Bovara's medical history and examined him. Bovara had brought with him an angiogram of his coronary blood vessels that was taken at another hospital following a heart attack. Dr. Pascale was not trained in reading angiograms and did not perform angioplasty. According to Dr. Pascale, interventionist cardiologists and surgeons were the physicians who made the decisions on who was to undergo angioplasty, bypass surgery, or noninterventionist medical care, and whether angioplasty was contraindicated for Bovara was "totally" up to the interventionists. Dr. Pascale did not know how the conclusion that angioplasty could be done was made.

Dr. Pascale did not review Bovara's angiogram and, as part of the usual procedure for CRC, gave it to a staff member for a cardiac interventionist to review. Drs. Edgett and Bliley were cardiac interventionists at the hospital and CRC, and they reviewed the angiogram. St. Francis contracted with CRC to produce cardiology services at St. Francis. Dr. Pascale received a verbal message that Drs. Bliley and Edgett believed that Bovara's condition allowed the patient to have angioplasty; he did not recall if the message was directly from the physicians or from a nurse. Normally he did not get an opinion in writing from the interventionists. Dr. Pascale wrote in the hospital chart that "catheterization reviewed by Drs. Bliley and Edgett."

Dr. Pascale gave Bovara the joint opinion of Drs. Bliley and Edgett that Bovara was a candidate for angioplasty. He did not tell Bovara that he was a good candidate; he told Bovara that "his people" felt Bovara was a candidate. He had no opinion on angioplasty for Bovara. He told Bovara that he would have a conference with the interventionist cardiologists because he had not really discussed the angioplasty issue with them firsthand. Dr. Pascale testified that he had a later discussion about Bovara with Drs. Edgett and Bliley. Bovara called Dr. Pascale the week following the visit. Dr. Pascale told Bovara that he had confirmed with the other physicians that Bovara was a candidate for angioplasty. He never spoke to Bovara again.

Dr. Bliley testified that he was commonly asked by his "partners" solely to view a film, to tell them if angioplasty was technically feasible, and to ascertain purely on the basis of the film the relative risks of the procedure. He believed that angioplasty was a moderate risk to Bovara because of the length of the lesion in the artery. At the time of his review, he did not review Bovara's medical records from the other hospital and he did not have any contact with Bovara. He did not write anything down in reference to his review.

Dr. Edgett testified that Dr. Pascale was one of his "associates" upon whose request he reviewed Bovara's angiogram. Dr. Edgett never had any discussions with Bovara. He was not asked whether Bovara could have a bypass operation, and he did not recommend angioplasty over a bypass; he just answered a question as to whether angioplasty was possible. He told Dr. Pascale that the case could be handled with angioplasty. Dr. Edgett did not recall any other discussions about the case with Dr. Pascale. He did not have any notes or dictate anything on his review. Dr. Edgett saw Bovara during resuscitation efforts.

In order to make a recommendation as to what a patient should do, Dr. Edgett testified that he would do more than just review the angiogram; he would examine the patient, review other data, and discuss the relative risks and benefits of each type of therapy. Dr. Edgett testified that it was not his job to make a recommendation of which therapy Bovara should have followed. Dr. Edgett testified that such a recommendation was the job of the physician who examined the patient, although he also testified that whether to recommend angioplasty or some other treatment would be up to the physician who was going to do the procedure.

Dr. Bliley was working in the cardiac catheterization laboratory the day that Bovara was scheduled, but Dr. Bliley asked Dr. Allocco to start Bovara's angioplasty because Dr. Bliley was going to be delayed. Before starting the angioplasty, Dr. Allocco looked at Bovara's angiogram and examined Bovara. Based on this, it was Dr. Allocco's opinion

that Bovara was a candidate for angioplasty. Dr. Allocco testified that if he had felt that Bovara was not a candidate for angioplasty, he could have cancelled the procedure. Bovara went into full cardiac arrest during the angioplasty, and Dr. Bliley aided in the unsuccessful resuscitation.

Drs. Bliley and Edgett did not bill Bovara for their time.

On May 13, 1997, the trial court granted summary judgment for Drs. Bliley and Edgett. Supreme Court Rule 304(a) (134 Ill. 2d R. 304(a)) language was allowed on July 18, 1997.

## DISCUSSION

Plaintiffs argue on appeal that the summary judgment order in favor of Drs. Bliley and Edgett should be reversed because there are genuine issues of material fact as to whether Drs. Bliley and Edgett formed a physician-patient relationship with Bovara or otherwise owed a duty to Bovara by reviewing the angiogram, by opining that Bovara was a candidate for angioplasty and by thereafter expanding their participation in the care and treatment of Bovara.

■ A motion for summary judgment is to be granted if "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 1996). The pleadings, depositions, admissions, and affidavits on file must be construed against the movant and in favor of the opponent of the motion. *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 158 Ill. 2d 240, 249, 633 N.E.2d 627 (1994).

Summary judgment is a drastic means of disposing of litigation, and the right of the moving party to obtain summary judgment must be clear and free of doubt. *Jackson*, 158 Ill. 2d at 249. Where doubt exists as to the right of summary judgment, the wiser judicial policy is to permit resolution of the dispute by a trial. *Jackson*, 158 Ill. 2d at 249. The reviewing court's function is to determine *de novo* whether the judgment entered was correct as a matter of law. *Cates v. Cates*, 156 Ill. 2d 76, 78, 619 N.E.2d 715 (1993).

■ In a negligence action for medical malpractice, a plaintiff must prove that the defendant owed a duty to the plaintiff, a breach of that duty, and an injury resulting from the breach. *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 525, 513 N.E.2d 387 (1987). Reasonable foreseeability of injury is a key concern in determining whether a duty exists, but it is not the only consideration. *Kirk*, 117 Ill. 2d at 526. The question of duty takes into account the likelihood of injury, the magnitude of the burden of guarding against it and the consequences of placing that burden on the defendant. *Lance v. Senior*, 36 Ill. 2d 516, 518, 224 N.E.2d 231 (1967).

■ The physician-patient relationship is a consensual relationship in which the patient knowingly seeks the physician's assistance and in which the physician knowingly accepts the person as a patient. *Reynolds v. Decatur Memorial Hospital*, 277 Ill. App. 3d 80, 85, 660 N.E.2d 235 (1996). A consensual relationship can be found to exist where a physician contacts another physician on behalf of the patient (*Reynolds*, 277 Ill. App. 3d at 85) or where a physician accepts a referral of a patient (*Davis v. Weiskopf*, 108 Ill. App. 3d 505, 512-13, 439 N.E.2d 60 (1982)); the reasoning is that the consent of the patient to the service provided by the second physician is implied (*Walters v. Rinker*, 520 N.E.2d 468, 472 (Ind. App. 1988)).

Defendants argue that their case is governed by *Reynolds*, 277 Ill. App. 3d 80, 660 N.E.2d 235, in which the examining physician telephoned a second physician at home seeking advice on diagnosing a child, and the second physician's only participation in the treatment of the child was his suggestion that a particular test be used to rule out certain illnesses. The first physician allegedly misdiagnosed the child's illness, and the second physician was made a defendant in the medical-malpractice lawsuit.

The court held that there was no physician-patient relationship between the second physician and the patient, nor any duty owed by him, because he gave an "informal opinion" at the request of the treating physician. *Reynolds*, 277 Ill. App. 3d at 85. The court noted that this was not the case where a physician was asked to provide a service for the patient, conduct laboratory tests, or review test results. *Reynolds*, 277 Ill. App. 3d at 85. The physician "did nothing more than answer an inquiry from a colleague." *Reynolds*, 277 Ill. App. 3d at 85. The court distinguished the case where a physician accepts a referral of the patient. *Reynolds*, 277 Ill. App. 3d at 85.

The facts of *Reynolds* are distinguishable. While the consulting physician in *Reynolds* just suggested a test and was not responsible for any portion of the patient's diagnosis or treatment, Drs. Bliley and Edgett reviewed test results and interpreted them. *Reynolds* distinguished the case where a physician reviews test results. 277 Ill. App. 3d at 85.

■ We find helpful the cases that have found a physician-patient relationship between the patient and a radiologist or a pathologist, who had no actual contact with the patient, where they performed a service for the benefit of the patient. *E.g., Walters v. Rinker*, 520 N.E.2d 468 (Ind. App. 1988) (pathologist); *Phillips v. Good Samaritan Hospital*, 65 Ohio App. 2d 112, 416 N.E.2d 646 (1979) (radiologist); *Dougherty v. Gifford*, 826 S.W.2d 668 (Tex. Ct. App. 1992) (pathologist).

Similarly, a trier of fact might conclude that Drs. Bliley and Edgett performed a service for Bovara as part of a CRC team of physicians. Drs. Pascale, Bliley and Edgett were employees and associates of St. Francis Hospital and CRC. Drs. Bliley and Edgett knew or should have known that Dr. Pascale was not trained to read angiograms and did not perform angioplasty operations. The trier of fact may find that, when Drs. Bliley and Edgett received the angiogram that came from Dr. Pascale, they knew or should have known that their medical opinion would be passed on to the patient by Dr. Pascale. If their medical opinion would have been that Bovara was not a candidate for an angioplasty operation, it was probable that there would not have been an angioplasty operation. On the other hand, if their medical opinion was that Bovara was a candidate for an angioplasty operation, it was probable that Dr. Pascale would inform Bovara that he could have an angioplasty procedure. In any event, the trier of fact could find that Drs. Bliley and Edgett knew or should have known that their medical opinion was crucial to Bovara.

When Dr. Pascale needed an interventionist cardiologist to read an angiogram and give an opinion, he would turn to someone from CRC and would rely on that opinion. Also, if an angioplasty operation were to be performed on Bovara, an interventionist cardiologist from CRC would perform the operation. The trier of fact might find that Drs. Bliley and Edgett gave their medical opinion during the regular course of their duties and not as mere volunteers.

Drs. Bliley and Edgett argue that similarly to the physician in *Reynolds* they just gave an "opinion." While in general an opinion is a "belief or conclusion held with confidence, but not substantiated by positive knowledge or proof" (American Heritage Dictionary 872 (2d Coll. ed. 1985)), a medical opinion in contrast connotes a conclusive and knowledgeable statement: an "evaluation or judgment based on special knowledge and given by an expert" (American Heritage Dictionary 872 (2d Coll. ed. 1985). Whether the recommendation of Drs. Bliley and Edgett was of the latter or former kind of opinion is for the trier of fact to determine.

Drs. Bliley and Edgett also argue that their opinion was "informal." Whether the statements of Drs. Bliley and Edgett were informal—not rendered according to prescribed procedures (American Heritage Dictionary 526 (2d Coll. ed. 1985))—is also for the trier of fact to decide. Formality of an opinion is not a determinative test of the presence of a physician-patient relationship; Dr. Pascale stated that normally he did not get an opinion in writing from the interventionists.

According to Dr. Pascale, he was not the physician ultimately

responsible for determining whether angioplasty was possible because he was not qualified to evaluate angiograms. It is a question of fact as to whether Drs. Bliley and Edgett were requested by Dr. Pascale to render a service for Bovara of interpreting test results to determine the suitability of a medical procedure that would be performed by a CRC cardiologist.

After the film was reviewed, Dr. Pascale met with Drs. Bliley and Edgett in the office, where they discussed Bovara's history and the decision was made to perform angioplasty. Dr. Pascale told Bovara that the recommendation to perform angioplasty was coming from the physicians who were scheduled to perform the operation. Dr. Bliley was scheduled to perform the procedure on that day but was temporarily delayed a few minutes. Dr. Allocco stated:

> "Dr. Bliley came to me and stated he had a patient who was going to do PTCA [the angioplasty], and he was going to be delayed a few minutes and could I go down and start the procedure."

This follow up by the two defendants indicated that they were more involved with the patient than merely reviewing a film. The decision to recommend angioplasty was made in the office with Drs. Pascale, Bliley and Edgett present after discussing Bovara's history. Also, Dr. Bliley told Dr. Allocco that he had a patient on whom he was going to operate.

In addition, Dr. Pascale recorded on Bovara's hospital chart that "catheterization reviewed by Drs. Bliley and Edgett." All the facts that the plaintiff could introduce in a trial show that there is a genuine issue of material fact as to whether a physician-patient relationship was formed between Drs. Bliley and Edgett and Bovara and whether they owed a duty of care to Bovara and breached that duty.

Drs. Bliley and Edgett also argue that summary judgment was properly entered in their favor because their joint opinion was inconsequential because Dr. Allocco could have decided to cancel the angioplasty if he did not believe that angioplasty was indicated. However, Dr. Allocco would not have had to decide whether to perform angioplasty if Drs. Bliley and Edgett had not informed Dr. Pascale that Bovara was a candidate for the procedure. Whether the alleged negligence of Drs. Bliley and Edgett was a proximate cause of Bovara's death is another fact issue that precludes summary judgment.

Summary judgment in favor of Drs. Bliley and Edgett also could not have been based on the fact, which these defendants stress, that they did not opine whether angioplasty was the best treatment option for Bovara. This argument is incorrect because defendants are not alleged to have chosen the wrong treatment— defendants are sought to be held liable for negligence in performing the service of concluding

whether Bovara was a candidate for an angioplasty procedure knowing that their opinion was crucial.

We note that most of the cases that defendants have cited that found no physician-patient relationship or other duty owed by a physician are easily distinguishable as not involving a consulting physician's providing a service for a patient. *Oliver v. Brock*, 342 So. 2d 1, 4 (Ala. 1976) (a second physician had a casual conversation with the treating physician concerning another patient in which the treating physician described generally the injuries of plaintiff patient and the type of treatment being given to which the second physician responded that he thought the treatment was correct); *Hill v. Kokosy*, 186 Mich. App. 300, 463 N.W.2d 265 (1990) (the consulting physician was contacted by telephone by a treating physician to discuss treatment alternatives and gave recommendations—which were not described in the court's opinion—that were to be accepted or rejected by the treating physician); *Flynn v. Bausch*, 238 Neb. 61, 67, 469 N.W.2d 125, 129 (1991) (in a general conversation occurring in a nursery, where the second physician was attending to another infant, he advised that a transfusion be delayed pending the development of further data and that he be contacted again if the information indicated something different); *Sullenger v. Setco Northwest, Inc.*, 74 Or. App. 345, 348-49, 702 P.2d 1139, 1141 (1985) (the consulting physician did not have duty to patient before he assumed management of the case where he turned down the treating physician's earlier request to manage the case); *Lopez v. Aziz*, 852 S.W.2d 303, 306 (Tex. Ct. App. 1993) (a specialist who was consulted once by telephone by the treating physician advised a complete laboratory work-up); but *cf. Minster v. Pohl*, 206 Ga. App. 617, 621, 426 S.E.2d 204, 206 (1992) (although, on request of a nurse, the emergency-room physician on duty viewed an X ray to verify that the nurse had properly replaced a feeding tube, the physician was not acting as the patient's physician).

We hold that the trial court erred in entering summary judgment in favor of Drs. Bliley and Edgett because there was a genuine issue of fact as to whether they acted as Bovara's physicians by providing a service for Bovara and whether they owed a duty to Bovara.

The judgment of the trial court is reversed, and the cause is remanded.

Reversed and remanded.

McNAMARA and SOUTH, JJ., concur.