# Illinois Official Reports

## Appellate Court

---

**Mackey v. Sarroca**, 2015 IL App (3d) 130219

---

| | |
|---|---|
| Appellate Court Caption | MICHELLE MACKEY and RONALD MACKEY, Plaintiffs-Appellants, v. MANUEL VILLARROY SARROCA, M.D.; SILVER CROSS HOSPITAL AND MEDICAL CENTERS, an Illinois Not-For-Profit Corporation; EM STRATEGIES, LTD., Defendants (John DeFranco, M.D., Defendant-Appellee). |
| District & No. | Third District<br>Docket No. 3-13-0219 |
| Filed<br>Rehearing denied | April 27, 2015<br>July 6, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 11-L-269; the Hon. Michael J. Powers, Judge, presiding. |
| Judgment | Reversed; cause remanded. |
| Counsel on Appeal | Dennis T. Schoen (argued) and Whitney B. Mayster, both of Dennis T. Schoen, P.C., of Chicago, for appellants.<br><br>Robert M. Collins, Catherine Basque Weiler (argued), and Lauren M. Wadzunas, all of Swanson, Martin & Bell, LLP, of Chicago, for appellee.<br><br>Leslie J. Rosen, of Leslie J. Rosen Attorney at Law P.C., of Chicago, for *amicus curiae*.<br><br>Matthew B. Champlin, Troy A. Bozarth, and Daniel W. Farroll, all of HeplerBroom, LLC, of Edwardsville, for *amicus curiae*. |

Panel                    JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Justices Carter and O'Brien concurred in the judgment and opinion.

**OPINION**

¶ 1     The plaintiffs, Michelle Mackey and Ronald Mackey, brought multiple medical malpractice counts against Dr. Manual Villarroy Sarroca, Silver Cross Hospital and Medical Centers, EM Strategies, Ltd., and Dr. John DeFranco. Dr. Sarroca was an attending physician in the emergency department at Silver Cross, and Dr. DeFranco was an on-call urologist under contract with Silver Cross Hospital. The plaintiffs alleged that Michelle Mackey (Michelle) suffered significant injuries (urosepsis and resulting severe complications) as the result of negligent treatment she allegedly received after she was transported to the emergency department at Silver Cross with complaints of persistent and severe abdominal pain. Only the counts against John DeFranco, M.D. (Dr. DeFranco), are at issue in this appeal. Dr. DeFranco filed a motion to dismiss the complaint against him, maintaining both that the claim against him was untimely and that he owed no duty of care to the plaintiffs due to the lack of a physician-patient relationship. 735 ILCS 5/2-619 (West 2010). The trial court granted the motion to dismiss based on a finding that Dr. DeFranco owed the plaintiffs no duty of care. The plaintiffs appealed.

¶ 2                                    I. FACTS
¶ 3     On Friday, May 14, 2010, Michelle was transported to the emergency department at Silver Cross Hospital complaining of persistent and severe abdominal and right kidney area pain. She was nauseous and vomiting upon arrival. Dr. Sarroca, the attending physician on-site, examined her immediately upon her arrival. He ordered various diagnostic tests, including urinalysis and a complete blood workup. Dr. Sarroca read the tests to reveal a urinary tract infection and a 6-millimeter utero-pelvic obstruction (*i.e.*, a kidney stone). In accordance with established Silver Cross Hospital protocol, Dr. Sarroca paged Dr. DeFranco, the urologist on call for Silver Cross on that particular day. The page was sent at approximately noon and Dr. DeFranco responded to the page within three minutes, using his cell phone to return the call. Dr. DeFranco was driving in his car when he received the page from Dr. Sarroca, so he parked his car to return the call. Dr. Sarroca gave Dr. DeFranco a detailed description of the patient's condition and reported the results of each of the diagnostic tests. Dr. DeFranco made notes from the conversation on a small "sticky" notepad. He wrote that the patient had a 6-millimeter obstructive kidney stone, no fever, and a normal white blood count, and reported no pain after receiving pain medication. Dr. DeFranco also wrote down that the patient had received analgesics and antibiotics. Dr. DeFranco told Dr. Sarroca that the patient should be given Flomax to help pass the stone. He also told Dr. Sarroca to tell the patient that he (Dr. DeFranco) wanted to see her in his office on Monday. Dr. DeFranco's last notation was "office Monday" and the word "sepsis" with a line drawn

through it. Dr. DeFranco would later state in his deposition that he wrote the "sepsis" and drew a line through it to indicate that there were no indications that the patient had sepsis at that time.

¶ 4    On May 17, 2010, Dr. DeFranco drafted a second set of notes regarding his conversation three days earlier with Dr. Sarroca. He noted that he had been paged by Dr. Sarroca. He noted Dr. Sarroca asked him if he was "the urologist" to which Dr. DeFranco replied "yes." Dr. Sarroca reported that he had a 39-year-old female in the emergency department with a 6-millimeter obstructing stone. She had been given Dilaudid and was currently pain free. Dr. DeFranco next noted that he asked Dr. Sarroca "is she stable" to which Dr. Sarroca responded "yes." Dr. DeFranco then noted that he asked Dr. Sarroca if the patient was afebrile and was told "yes." He noted asking Dr. Sarroca if the patient had a normal white blood count and being told "yes." The last notation on Dr. DeFranco's note was a question mark followed by the phrase "may have mentioned UA."

¶ 5    In a deposition, Dr. DeFranco testified that he was the urologist on-call for Silver Cross Hospital that day under a contract between his employer, Specialized Urologic Consultants, Ltd., and Silver Cross Hospital. As the on-call urologist, his responsibilities included giving the emergency room physician advice and recommendations regarding specific patients who presented with symptoms or conditions that might require the specialized expertise of a urologist. As an on-call urologist, Dr. DeFranco also had the authority to admit patients to the hospital if he believed that admission was warranted. He testified that his conversation with Dr. Sarroca was "just routine that most ERs tell us that [we] would [or] should see our patients within about 24 to 48 hours given that it's not going into a weekend after they've been seen in an emergency room; so we try to get them in as timely as possible." He also testified that he would normally ask the emergency attending physician if urinalysis had been completed, but he did not recall asking Dr. Sarroca about any urinalysis results. Dr. DeFranco also testified that he believed that it was the emergency attending physician's prerogative to make the clinical decision to prescribe antibiotics if the possibility of infection was present.[1]

¶ 6    Dr. Sarroca's deposition established that he regularly consulted with a specialist, such as Dr. DeFranco, if he believed that the situation required consultation with a particular specialist. He also testified that established procedures dictated consultation with a specialist when the facts and circumstances warranted. In light of the fact that this patient presented with a rather large kidney stone, Dr. Sarroca believed that he needed to "refer to the urologist." Dr. Sarroca testified that he believed the consulting urologist was ultimately responsible for decisions regarding the patient's care because once the on-call specialist has been contacted, the specialist "takes over decision making whether to do this or that." Dr. Sarroca explained that when he consults with an on-call specialist, the specialist gives him specific advice and recommendations for the patient which he takes "into account in a big

---

[1]There appears to be a dispute of fact as to whether Dr. Sarroca told Dr. DeFranco that the patient had received antibiotics as well as whether Dr. DeFranco instructed Dr. Sarroca to administer antibiotics. Because the issue is before this court on a motion to dismiss pursuant to section 2-619 of the Code of Civil Prcedure (735 ILCS 5/2-619 (West 2010)), we consider all well-pled facts in the complaint as true and consider the facts in the light most favorable to the plaintiff. *Clemons v. Mechanical Devices Co.*, 202 Ill. 2d 344, 352 (2002).

way because that's what they recommend." Dr. Sarroca stated that the on-call specialist's "decision is what is the final disposition of the patient" and he would follow the on-call specialist's instructions even if he disagreed with those instructions.

¶ 7 Dr. Sarroca also testified that he reviewed all the test results, including urinalysis results, with Dr. DeFranco, because he wanted Dr. DeFranco to have all relevant information so that Dr. DeFranco would "have the option of giving an impression as to whether to consider [anything] as significant or not." He testified that he would have asked Dr. DeFranco for specific instructions based upon the diagnostic test results. He specifically expected Dr. DeFranco to decide whether to admit the patient and whether there was an urgent need to begin antibiotic therapy. Dr. Sarroca thought that admitting the patient was advisable due to the size of the kidney stone, but he would not admit her unless instructed to do so by Dr. DeFranco. He testified that he was somewhat surprised when Dr. DeFranco did not order the patient admitted. Dr. DeFranco instead recommended pain medication and Flomax to help pass the stone and told Dr. Sarroca to instruct the patient to follow up with an appointment at his office on Monday. Dr. Sarroca testified that Dr. DeFranco did not tell him to prescribe any antibiotic treatment, even though the urinalysis results seemed to him to indicate that a course of antibiotic treatment might be helpful. Dr. Sarroca testified he did not give the patient antibiotics, but if Dr. DeFranco had told him to prescribe antibiotics, he would have done so. Dr. Sarroca followed Dr. DeFranco's recommendations and discharged the patient with instructions to follow up with Dr. DeFranco "next week." The instructions included the telephone number for Dr. DeFranco's office. Michelle Mackey was discharged from the emergency department at that time.

¶ 8 Ronald Mackey made an appointment for Michelle with Dr. DeFranco on Monday, May 17, 2010. She subsequently developed a severe case of septic shock secondary to urosepsis, disseminated intravascular coagulopathy, adult respiratory distress syndrome, respiratory failure, renal failure, multisystem organ failure, severe deconditioning, and metabolic encephalopathy. The plaintiffs' medical malpractice complaint alleged that these conditions were the direct and proximate result of Dr. DeFranco's failure to engage in a course of treatment to prevent septic infection.

¶ 9 Dr. DeFranco filed a motion to dismiss pursuant to section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2010)) maintaining that the complaint against him was untimely and deficient as a matter of law because he owed no duty of care to the plaintiffs based upon the lack of a physician-patient relationship. The circuit court granted Dr. DeFranco's motion, finding that he owed no professional duty of care to the plaintiffs. This appeal followed.

¶ 10 II. ANALYSIS

¶ 11 A. Timeliness of the Complaint

¶ 12 As a preliminary matter, we will address the appellee's argument that the complaint against Dr. DeFranco was untimely. The defendant raised this issue before the circuit court, but no ruling was made on that specific claim in the motion to dismiss. The appellee maintains that we may sustain a judgment on appeal on any basis that is supported by the record. *American Zurich Insurance Co. v. Wilcox & Christopoulos, L.L.C.*, 2013 IL App (1st) 120402, ¶ 33. Whether a complaint is filed in a timely manner is a question of fact. *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 416 (1981). Motions alleging that the complaint is

untimely are filed in the circuit court under section 2-619 of the Code of Civil Procedure. 735 ILCS 5/2-619 (West 2010); *Myers v. Rockford Systems, Inc.*, 254 Ill. App. 3d 56, 61 (1993). A reviewing court will take all well-pled facts in the complaint as true (*Nikolic v. Seidenberg*, 242 Ill. App. 3d 96, 99 (1993)) and will not weigh the evidence or decide controverted material issues of fact. *Draper v. Frontier Insurance Co.*, 265 Ill. App. 3d 739, 742 (1994). Our review of a timeliness ruling is *de novo*. *Toombs v. City of Champaign*, 245 Ill. App. 3d 580, 583 (1993).

¶ 13    Medical malpractice claims must be filed within the time period mandated by section 13-212(a) of the Code of Civil Procedure, which provides that a claim cannot be brought "more than 2 years after the date on which the claimant knew, or through the use of reasonable diligence should have known *** of the existence of the injury or death for which damages are sought in the action." 735 ILCS 5/13-212(a) (West 2010).

¶ 14    In the instant matter, the plaintiffs allege negligent treatment on or about May 15, 2010. The plaintiffs filed suit against all the named defendants except Dr. DeFranco on April 7, 2011. Dr. DeFranco was named as a respondent in discovery after Dr. Sarroco's discovery deposition was taken in August 2012. Shortly thereafter an amended complaint was filed alleging counts against Dr. DeFranco. It was during the Sarroco deposition that the plaintiffs first discovered that Dr. DeFranco engaged in conduct which, allegedly, led to Michelle's sepsis and gave rise to a complaint of professional negligence against Dr. DeFranco. The plaintiffs maintain, therefore, that they filed their complaint against Dr. DeFranco within two years of discovering his alleged breach of professional duty.

¶ 15    Plaintiffs may file a timely complaint within two years of discovering the existence of a cause of action against a particular defendant. *Nolan v. Johns-Manville Asbestos*, 85 Ill. 2d 161 (1981). The "discovery rule" provides that the cause of action accrues when the plaintiff knows or reasonably should know of the injury and also knows or reasonably should have known that the injury was caused by the wrongful acts of the defendant. *Id*. at 169. The question of when a party knew or should have known of both an injury and its wrongful cause is one of fact. *Id*. The time begins to run, not when the plaintiff has knowledge of the injury, but only when the plaintiff reasonably discovers that the defendant's negligence may have contributed to the injury. *Arndt v. Resurrection Hospital*, 163 Ill. App. 3d 209, 213 (1987).

¶ 16    In the instant matter, the well-pled facts support a finding that the plaintiffs only discovered the role of Dr. DeFranco in Michelle's care, and that his actions or inactions allegedly caused her injuries, by way of Dr. Sarroca's discovery deposition. There are no facts alleged in the complaint from which it could be found that the plaintiffs knew or reasonably should have known of Dr. DeFranco's alleged breach of a professional duty of care at any time prior to the Sarroca deposition. In fact, it would appear from the record that certain medical treatment records may have erroneously recorded that Dr. DeFranco had ordered Dr. Sarroca to administer antibiotics, and it was only after Dr. Sarroca's deposition that it was discovered that Dr. DeFranco had not addressed antibiotic treatment when he allegedly determined that Michelle was not in danger of sepsis. See *supra* ¶ 5 n.1. Taking the well-pled facts as true, and finding no contrary facts in the record, we find that the complaint against Dr. DeFranco was timely filed.

¶ 17                                    B. Professional Duty of Care

¶ 18        The substantive issue in this matter is whether the circuit court properly granted Dr. DeFranco's motion to dismiss the complaint based upon its finding that the defendant owed no duty of professional care to the plaintiffs. A motion to dismiss pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2010)) will be granted only where the plaintiff can prove no set of facts that would support the cause of action. *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 277-78 (2003). There are no factual or credibility determinations to be made since all well-pled facts are taken as true and all that is left is to determine whether the plaintiff can state a cause of action as a matter of law. *Id.* If there is a dispute of facts, those facts advanced in the complaint are taken as true for purposes of ruling on the motion to dismiss. *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 115 (1993). A motion to dismiss under this section "admits the legal sufficiency of the plaintiff's claim but asserts certain defects or defenses outside the pleadings which defeat the claim." *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 55. A reviewing court will review the question of law independent of the trial court's ruling, using a *de novo* standard of review. *Clemons v. Mechanical Devices Co.*, 202 Ill. 2d 344, 452 (2002).

¶ 19        A legally sufficient complaint alleging medical malpractice must set out facts establishing the existence of a duty owed by the defendant to the plaintiffs, a breach of that duty, and an injury proximately caused by that breach. *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 525 (1987). A physician's duty arises only when a physician-patient relationship has been expressly established or there is a special relationship such as when one physician is asked by another physician to provide a service to the patient, conduct laboratory tests, or review test results. *Siwa v. Koch*, 388 Ill. App. 3d 444, 447 (2009); *Weiss v. Rush North Shore Medical Center*, 372 Ill. App. 3d 186, 188 (2007); *Reynolds v. Decatur Memorial Hospital*, 277 Ill. App. 3d 80, 84 (1996). The matter at hand tests whether a special relationship existed between Dr. DeFranco and Michelle which gave rise to a physician-patient relationship and imposed a professional duty of care upon Dr. DeFranco.

¶ 20        The special relationship giving rise to a duty of care may exist even in the absence of any meeting between the physician and the patient where the physician performs specific services for the benefit of the patient. *Weiss*, 372 Ill. App. 3d at 189; *Bovara v. St. Francis Hospital*, 298 Ill. App. 3d 1025, 1026-27 (1998). A physician-patient relationship is established where the physician takes some affirmative action to participate in the care, evaluation, diagnosis or treatment of a specific patient. *Lenahan v. University of Chicago*, 348 Ill. App. 3d 155, 164 (2004). The central inquiry is whether the physician has been asked to provide a specific service for the benefit of a specific patient. *Bovara*, 298 Ill. App. 3d at 1030.

¶ 21        In *Bovara*, the plaintiff was examined by a cardiologist at the hospital where he was being treated for symptoms of heart disease. His treating cardiologist did not review the plaintiff's angiogram results, but as part of the routine hospital procedure, sent the test results to two "cardiac interventionists" for their review. According to the cardiologist, the cardiac interventionists were employed by the hospital and were responsible for reviewing cardiac test results and making the decision regarding surgical intervention or noninterventionist care. The cardiac interventionists, after reviewing the plaintiff's test results and discussing the case with the treating physician, informed the treating cardiologist that the plaintiff was a candidate for surgical intervention. The plaintiff underwent an angioplasty procedure and

during the procedure went into cardiac arrest and was unable to be revived. The court held on appeal that there was a physician-patient relationship between the cardiac interventionists and the plaintiff because they were assigned by the hospital with the task of consulting with the treating physician, they reviewed the plaintiff's angiogram, they were compensated for their services, and they rendered a medical opinion as to whether the plaintiff was a candidate for surgery. *Bovara*, 298 Ill. App. 3d at 1031. The court specifically found that the interventionists were more involved with the plaintiff's treatment than merely reviewing test results. *Id.* at 1032.

¶ 22    In *Lenahan*, a special relationship establishing a duty of care was also found to exist even though the defendant physician had never met the plaintiff's decedent. *Lenahan*, 348 Ill. App. 3d at 166. In that case, the decedent was admitted to a hospital where the defendant physician had responsibility for determining which patients were eligible for inclusion in an experimental high-dose chemotherapy program. The defendant physician never personally examined the decedent and made the decision to admit the decedent in the experimental program based entirely upon reviewing test results and consulting with treating physicians. The appellate court held that a physician-patient relationship existed because the defendant had an active role in the decedent's care, was compensated for his services rendered for the plaintiff, reviewed test results, and made treatment determinations. *Id*. at 164-65.

¶ 23    By contrast, no special relationship establishing a duty of care was found to exist in *Reynolds*, where a physician who was informally consulted by the plaintiff's treating physician was held not to have a professional duty of care to the plaintiff. *Reynolds*, 277 Ill. App. 3d at 85. In *Reynolds*, the plaintiff's minor child was taken to the local hospital emergency department after falling off a sofa. The attending physician admitted the child for observation and called in the on-call pediatrician, who examined the child. The pediatrician called the defendant, a neurosurgeon, seeking advice on possible spinal cord damage. The call was to the defendant at his home and was not made pursuant to protocol or procedures. The defendant neurosurgeon did not have any specific on-call relationship with the hospital but often accepted calls from local physicians seeking informal advice. He was never compensated for the advice he gave. The pediatrician gave the neurosurgeon a brief synopsis of the patient's condition but did not review specific test results. The neurosurgeon suggested a spinal tap as a possible avenue to rule out meningitis. Ultimately the child was diagnosed with Gullian-Barre syndrome, which resulted in quadriplegia. The child's mother brought a professional negligence suit against the neurosurgeon, alleging that he should have examined the child and his medical records before rendering treatment advice. *Id*.

¶ 24    The *Reynolds* court upheld the dismissal of the complaint against the neurosurgeon. The court noted that a physician-patient relationship is normally a consensual relationship in which the patient or his guardian knowingly seeks the physician's assistance and the physician knowingly accepts the person as a patient. *Id*. The court also noted, however, that a physician-patient relationship can arise "where other persons contact a physician on behalf of a patient." *Id*. The court then discussed the facts surrounding the defendant's involvement in the case and noted that he was contacted "informally" rather than as part of an established protocol, he did not order, conduct, or review test results, and he was paid no fee. *Id*. The court held that "[a] doctor who gives an informal opinion at the request of a treating physician does not owe a duty of care to the patient whose case was discussed." *Id*.

¶ 25      In *Weiss*, the plaintiff was treated in the emergency department by a treating physician for a mental condition. The treating physician contacted the on-call psychiatrist only to arrange for follow-up care for the plaintiff. The physician discussed the plaintiff's condition and the need for follow-up care with the psychiatrist. The discussion was limited to the need for future care and the treating physician did not seek any advice regarding any actions or treatment currently needed by the plaintiff. The appellate court held that there was no physician-patient relationship established between the plaintiff and the psychiatrist because the psychiatrist did not perform any services for the plaintiff, did not perform any tests, did not analyze any test results, did not direct the physician in treating the plaintiff, did not form any clinical impressions of the plaintiff, and did not render a medical opinion regarding the plaintiff. *Weiss*, 372 Ill. App. 3d at 189.

¶ 26      Our review of the case law leads to a conclusion that a special relationship establishing a physician-patient relationship exists where, as in *Bovara* and *Lenahan*, the consulting physician is assigned the task of consulting as part of established procedures, protocols or contractual obligation with the hospital, is compensated for those consulting services, orders tests or reviews test results, gives specific medical advice regarding contemporaneous patient care, and makes decisions regarding the patient's current medical care. *Bovara*, 298 Ill. App. 3d at 1032; *Lenahan*, 346 Ill. App. 3d at 164-65. However, where a physician is consulted or advice is sought on an informal basis, where no compensation is received by the consulting physician, and the consulting physician does not order tests or review test results and has no input in the actual treatment of the patient, no special relationship creating a physician-patient relationship has been established. *Reynolds*, 277 Ill. App. 3d at 85; *Weiss*, 372 Ill. App. 3d at 189. To determine whether there was a physician-patient relationship between Dr. DeFranco and Michelle Mackey, we must consider whether the facts presented in this case are more similar to the facts presented in *Bovara* and *Lenahan*, or *Reynolds* and *Weiss*. See *Gillespie v. University of Chicago Hospitals*, 387 Ill. App. 3d 540, 545 (2008).

¶ 27      Viewing the evidence in light most favorable to the plaintiff, we find that it was error for the trial court to dismiss the complaint. The well-pled facts, taken as true for purposes of ruling on the motion to dismiss, establish that Dr. DeFranco's relationship with Michelle was more akin to those physicians found to have a special relationship giving rise to a professional duty of care. Specifically, the complaint established that Dr. DeFranco: (1) was the on-call urologist assigned to consult with treating physicians at Silver Cross Hospital pursuant to a contract between the hospital and his employer; (2) was compensated for his consulting services; (3) was consulted by the emergency room physician for Michelle's benefit for the specific purpose of rendering diagnostic and medical advice regarding her treatment; (4) received specific information regarding her history, symptoms, and diagnostic test results; (5) evaluated those tests results and formed a medical opinion that she was not in danger of sepsis; (6) was actually responsible for making decision regarding her care and whether she was to be admitted or released; and (7) decided that Michelle did not need to be admitted but could be discharged with an instruction to seek an out-patient follow-up appointment on Monday. Taking these facts as true, it is clear that Dr. Franco's relationship with Michelle was a physician-patient relationship which gave rise to a professional duty of care. We find that the trial court erred in granting the motion to dismiss and that the matter should be remanded for further proceedings.

## III. CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Will County dismissing the complaint against Dr. DeFranco is reversed and the cause is remanded for further proceedings consistent with this disposition.

Reversed; cause remanded.