2024 IL App (2d) 230018-U
No. 2-23-0018
Order filed December 30, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| DIANE DEWELL, Individually and as Special Representative of the Estate of Edgar Dewell, Deceased, | ) ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 11-L-620 |
| MARK STEPHEN HALL, M.D.; STEPHEN HOLTSFORD, M.D.; NICHOLAS SCHLAGETER, M.D.; TRI CITY NEUROLOGY, S.C.; VALLEY EMERGENCY MANAGEMENT, LTD.; and DELNOR COMMUNITY HOSPITAL, | ) ) ) ) ) ) ) | Honorable |
| Defendants-Appellees. | ) ) | Kevin T. Busch, Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Presiding Justice Kennedy and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court did not err in entering a directed verdict in favor of a neurologist who gave testing recommendations to treating emergency room physicians via telephone because he owed no legal duty to the patient in a medical negligence suit.

¶ 2    In this medical negligence suit, plaintiff, Diane Dewell, individually and as special representative of her late husband Edgar Dewell's (Dewell) estate, alleged that defendants Delnor

Community Hospital (Delnor); Valley Emergency Management, LTD. (Valley), the company that staffed Delnor's emergency department; Dr. Mark Hall, M.D.; Dr. Stephen Holtsford, M.D.; Dr. Nicholas Schlageter, M.D.; and Dr. Schlageter's medical practice Tri City Neurology, S.C. (Tri City), failed to timely diagnose and treat Dewell for herpes simplex encephalitis (HSE), a rare type of viral brain inflammation. Plaintiff alleged that the failure to timely diagnose and treat Dewell resulted in cognitive and quality of life issues for Dewell and loss of consortium for plaintiff. The case proceeded to a jury trial. After the close of plaintiff's case-in-chief, the trial court entered a directed verdict in favor of Dr. Schlageter and Tri City. The jury returned a verdict in favor of the remaining defendants.[1] Plaintiff timely appealed. We affirm.

¶ 3                                     I. BACKGROUND

¶ 4      Between October 31 and November 9, 2022, the trial court conducted a jury trial on plaintiff's claims. The relevant portions of that trial are summarized below.

¶ 5      Dewell, 63 years old at the time, began feeling unwell on August 15, 2008. He complained to plaintiff about a headache, fatigue, and loss of appetite. The next day he had a headache and elevated temperature. On August 19, 2008, Dewell woke plaintiff up around 4 a.m. He told plaintiff that he smelled things that were not there, like burlap and pallets, which were the odors of his workplace.

¶ 6      Around 11:30 a.m. that day, Dewell visited his primary care physician, Dr. Mark Bernhard. Dewell complained of headaches, memory problems, inability to concentrate, and smelling odors not present. Dr. Bernhard examined Dewell and was concerned that Dewell might have encephalitis. Dr. Bernhard suggested that plaintiff take Dewell to Delnor for testing. Dr. Bernhard

_____

[1] Delnor was dismissed prior to trial.

contacted Delnor's emergency department and spoke with Dr. Hall. He let Dr. Hall know that Dewell was on the way and advised Dr. Hall of his concerns.

¶ 7    Dr. Hall examined Dewell after he arrived at Delnor. Dr. Hall provided anti-nausea medication and pain reliever. His working diagnosis was viral encephalitis. Looking for evidence of an infection, Dr. Hall ordered a complete blood test and a lumbar puncture (also called a spinal tap) to test Dewell's cerebral spinal fluid. He also ordered a comprehensive metabolic panel to search for any metabolic abnormalities.

¶ 8    After all the tests ordered by Dr. Hall came back negative, Dr. Hall reached out to Dr. Bernhard to discuss the results. Dr. Bernhard suggested that Dr. Hall contact Dr. Schlageter, a neurologist on staff at Delnor, for his input. Delnor did not have an on-call procedure for neurologists at the time. Dr. Schlageter spoke to Dr. Hall by telephone while Dr. Schlageter was driving in his car to St. Joesph's Hospital in Elgin, where he was also on staff. Dr. Hall explained Dewell's complaints, the results of the tests that were taken, and sought Dr. Schlageter's recommendations for further testing. Dr. Schlageter recommended testing Dewell's erythrocyte sedimentation rate (ESR), which shows the amount of general inflammation in the body.

¶ 9    After speaking with Dr. Schlageter, Dr. Hall spoke with Dewell and plaintiff. He ordered the ESR test but had to convince Dewell and plaintiff to stay at Delnor for the results. Dr. Hall's shift ended before the ESR test results were available. Dr. Hall turned over Dewell's care to Dr. Holtsford. Dr. Hall informed Dr. Holtsford about Dewell's complaints and testing history. He also informed Dr. Holtsford about his communication with Dr. Schlageter and advised Dr. Holtsford to contact Dr. Schlageter after the ESR test results were available.

¶ 10    The ESR test came back normal and Dr. Holtsford called Dr. Schlageter for further testing recommendations. Dr. Schlageter recommended a brain MRI. Dr. Holtsford spoke with Dewell

and plaintiff about this recommendation, but they declined the MRI because of their high insurance deductible. Plaintiff also said that Dr. Holtsford did not explain why an MRI was necessary.

¶ 11   After Dewell declined the MRI, Dr. Holtsford did not speak with Dr. Schlageter again. Dewell and plaintiff also did not speak with Dr. Schlageter that day. Dr. Schlageter did not record or keep notes from the two conversations with Dr. Hall and Dr. Holtsford and he did not bill for the conversations. Neither Dr. Hall nor Dr. Holtsford asked Dr. Schlageter for a diagnosis or differential diagnosis of Dewell's condition. Dr. Schlageter did not recall either doctor stating that they suspected viral encephalitis. Dr. Hall and Dr. Holtsford also did not discuss admitting Dewell into Delnor with Dr. Schlageter, who was the only of the three doctors with admitting privileges.

¶ 12   Dewell was discharged from Delnor early in the evening of August 19. The discharge paperwork instructed Dewell to return to Delnor if his condition got worse. It also recommended that Dewell follow up with Dr. Bernhard and contact Dr. Schlageter as soon as possible. Neither plaintiff nor Dewell contacted Dr. Schlageter.

¶ 13   Dewell slept most of the next day. On August 21, 2008, Dewell woke up and, according to plaintiff, was incoherent and unaware of his surroundings. He was brought to Delnor by ambulance. He was admitted, diagnosed with HSE, and treated with acyclovir, an anti-viral. Dr. Schlageter was contacted again by the Delnor emergency department on August 21. He recalled his previous conversations with Dr. Hall and Dr. Holtsford and asked what the MRI showed on August 19. He learned that Dewell declined the MRI. Dr. Schlageter ordered an MRI and went to the Delnor emergency department. By the time Dr. Schlageter arrived, Dewell had already been diagnosed and was receiving treatment.

¶ 14   HSE caused brain damage and memory issues for Dewell. According to plaintiff, Dewell's quality of life was severely diminished as a result. Prior to the infection, Dewell regularly spent

around 50 to 60 hours per week repairing cars and industrial equipment. Plaintiff and Dewell also regularly entertained and traveled. After the infection, Dewell could no longer repair vehicles because of memory and judgment problems. Dewell mostly stayed home, played with their cats, tried to read the newspaper, completed Sudoku puzzles, and slept. Plaintiff and Dewell's social and intimate life also disappeared. Dewell died in 2021 for reasons unrelated to HSE.

¶ 15    On November 7, 2022, after plaintiff rested her case-in-chief, Dr. Schlageter and Tri City moved for a directed verdict. They argued that Dr. Schlageter did not owe a legal duty to Dewell because he was not directly involved in Dewell's treatment or care. The trial court agreed and entered judgment in favor of Dr. Schlageter and Tri City the same day.

¶ 16    The trial continued against Dr. Hall, Dr. Holtsford, and Valley. The jury reached a general verdict in the remaining defendants' favor. Plaintiff did not seek any special interrogatories of the jury. The trial court entered judgment on the jury's verdict on November 9, 2022. Plaintiff moved for a new trial, arguing that the trial court erred in granting the motion for directed verdict. Plaintiff further argued that this error also resulted in an unfair trial for plaintiff as to Dr. Hall, Dr. Holtsford, and Valley. The trial court denied the motion and plaintiff appealed.

¶ 17                                II. ANALYSIS

¶ 18    On appeal, plaintiff argues that the trial court erred in entering a directed verdict in favor of Dr. Schlageter and Tri City. A motion for a directed verdict will be granted only where "all of the evidence so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 225 (2010). A directed verdict may be granted to a defendant where the plaintiff has failed to make out a *prima facie* case; that is, the plaintiff has failed to present at least some evidence on every necessary element of his or her cause of action. *Hemminger v. LeMay*, 2014 IL App (3d) 120392, ¶ 17. A motion for

directed verdict presents "only a question of law as to whether, when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiffs, there is a total failure or lack of evidence to prove any necessary element of the plaintiffs' case." *Merlo v. Public Service Co. of Northern Illinois*, 381 Ill. 300, 311 (1942); see also *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 37; *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006). The standard for the entry of a directed verdict "is a high one and is not appropriate if reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented." *Lawlor*, 2012 IL 112530, ¶ 37 (internal quotation marks and citations omitted). We review *de novo* a trial court's grant of a directed verdict. *Id.*

¶ 19    In a medical negligence action, a plaintiff must prove that a duty was owed by the defendant doctor, a breach of that duty, an injury proximately caused by the breach, and resultant damages. *Lewis v. OSF Healthcare System*, 2022 IL App (4th) 220016, ¶ 55. The central issue to resolving plaintiff's appeal is whether Dr. Schlageter owed a duty to Dewell during Dewell's treatment at Delnor on August 19, 2008. "A physician's duty arises only when a physician-patient relationship has been expressly established or there is a special relationship, such as when one physician is asked by another physician to provide service to the patient, conduct laboratory test results, or review test results." *Blagden v. McMillan*, 2023 IL App (4th) 220238, ¶ 42 (citing *Siwa v. Koch*, 388 Ill. App. 3d 444, 447 (2009); *Weiss v. Rush North Shore Medical Center*, 372 Ill. App. 3d 186, 188 (2007); and *Reynolds v. Decatur Memorial Hospital*, 277 Ill. App. 3d 80, 85 (1996)).

¶ 20    "The special relationship giving rise to a duty of care may exist even in the absence of any meeting between the physician and the patient where the physician performs specific services for the benefit of the patient." *Mackey v. Sarroca*, 2015 IL App (3d) 130219, ¶ 20 (citing *Weiss*, 372 Ill. App. 3d at 189; and *Bovara v. St. Francis Hospital*, 298 Ill. App. 3d 1025, 1026-27 (1998)).

This relationship "is established where the physician takes some affirmative action to participate in the care, evaluation, diagnosis or treatment of a specific patient." *Id.* (citing *Lenahan v. University of Chicago*, 348 Ill. App. 3d 155, 164 (2004)); see also *McIntyre v. Balagani*, 2019 IL App (3d) 140543-U, ¶ 69 ("Merely dispensing medical advice or offering a professional opinion in response to an inquiry from the patient's treating physician is not sufficient to create a duty").

¶ 21 The trial court relied on *Reynolds* when it granted Dr. Schlageter's motion for a directed verdict. In *Reynolds*, the plaintiff's child was injured after falling off a sofa and taken to a local hospital. 277 Ill. App. 3d at 81. The attending physician in the hospital's emergency department admitted the child for observation and called in the on-call pediatrician. *Id.* at 82. The pediatrician then called the defendant, a neurosurgeon, seeking advice about possible spinal cord damage. *Id.* The defendant did not have a formal on-call relationship with the hospital, but often accepted informal inquiries from local physicians for which he did not bill. *Id.* at 83. The pediatrician gave the defendant a brief synopsis of the child's history, explaining that the child fell from a couch, was listless, and had a fever of 102 degrees Fahrenheit. *Id.* at 82-83. The defendant recommended a spinal tap to rule out meningitis. *Id.* at 83. The defendant and the pediatrician agreed that the spinal tap would be performed and that the defendant would be contacted again for any further assistance. *Id.* The child was ultimately diagnosed with Guillain-Barré syndrome, which resulted in quadriplegia. *Id.* The plaintiff, the child's mother, alleged that the defendant should have examined the child and the child's medical records before giving treatment advice. *Id.* The trial court entered summary judgment in favor of the defendant, finding that the defendant did not owe the child a legal duty. *Id.*

¶ 22 On appeal, the appellate court affirmed the trial court's summary judgment. *Id.* at 85. The appellate court noted that "this is not a case in which [the defendant] was asked to provide a service

for [the child], conduct laboratory tests or review test results" and the defendant "did nothing more than answer an inquiry from a colleague." *Id.* It further noted that the defendant did not bill for the phone call and was not paid any fee. *Id.* Thus, the appellate court held that a "doctor who gives an informal opinion at the request of a treating physician does not owe a duty of care to the patient whose case was discussed." *Id.*

¶ 23    In so holding, the appellate court also observed the potential ramifications of ruling in the plaintiff's favor under those circumstances:

"[the plaintiff suggests] that what needs to be done is to find a physician-patient relationship to result from every such conversation. The consequence of such a rule would be significant. It would have a chilling effect upon [the] practice of medicine. It would stifle communication, education and professional association, all to the detriment of the patient. The likely effect in adopting [the] plaintiff's argument also would be that such informal conferences would no longer occur. To reiterate, this would inhibit the exchange of information and expertise among physicians and would not benefit the medical profession or persons seeking treatment." *Id.* at 86-87; see also *Higgins v. Blessing Hospital*, 2024 IL App (4th) 231531, ¶ 44 (reiterating the concerns expressed in *Reynolds*).

¶ 24    In the years since *Reynolds*, courts have applied its standards and made clear the circumstances under which the special physician-patient relationship is established for consulting physicians. This relationship, and the resulting legal duty, is established when "the consulting physician is assigned the task of consulting as part of established procedures, protocols or contractual obligation with the hospital, is compensated for those consulting services, orders tests or reviews test results, gives specific medical advice regarding contemporaneous patient care, and makes decisions regarding the patient's current medical care." *Mackey*, 2015 IL App (3d) 130219,

¶ 26 (citing *Bovara*, 298 Ill. App. 3d at 1032 (duty owed by two cardiac interventionists who were assigned by hospital to review test results and make decision regarding surgical intervention); and *Lenahan*, 348 Ill. App. 3d at 164-65 (duty owed by physician who made decision to admit patient to experimental high-dose chemotherapy program)); see also *Blagden*, 2023 IL App (4th) 220238, ¶ 60 (duty owed by on-call physician who collaborated with emergency department physician to make decision on the patient's hospital admission); *Slanger v. Advanced Urgent Care*, 2022 IL App (1st) 211579, ¶ 25 (duty owed by supervising emergency department physician who signed off on nurse practitioner's treatment plan).

¶ 25    Conversely, "where a physician is consulted or advice is sought on an informal basis, where no compensation is received by the consulting physician, the consulting physician does not order tests or review test results, and has no input in the actual treatment of the patient, no special relationship creating a physician-patient relationship has been established." *Mackey*, 2015 IL App (3d) 130219, ¶ 26 (citing *Reynolds*, 277 Ill. App. 3d at 85; and *Weiss*, 372 Ill. App. 3d at 189 (no duty owed by on-call psychiatrist who was contacted for follow-up care)); see also *Gillespie v. University of Chicago Hospitals*, 387 Ill. App. 3d 540, 545-46 (2008) (no duty owed by on-call physician who was not actively involved in the patient's treatment or care); *Estate of Kundert v. Illinois Valley Community Hospital*, 2012 IL App (3d) 110007 (no duty where plaintiff relied on medical advice after calling hospital); *McIntyre*, 2019 IL App (3d) 140543-U, ¶ 69 (no duty where defendant doctor had no authority to direct the patient's care and treatment).

¶ 26    Here, the facts established at trial are consistent with the circumstances under which no duty has been found for a consulting physician and are nearly indistinguishable from *Reynolds*. Dr. Schlageter was sought out by Dr. Hall on the recommendation of Dr. Bernhard, and not based on any formal procedures at Delnor. Dr. Schlageter was merely sought out for his advice on further

testing to help determine Dewell's possible ailment. He did not, and was not asked to, offer any diagnoses, render any medical opinion, order any tests, scrutinize any test results, make any admission determination, or perform any service for Dewell. Indeed, there is no evidence that Dr. Schlageter had any control over Dewell's care whatsoever. Instead, the direction and control of Dewell's care was entirely determined by Dr. Hall and Dr. Holtsford. Dr. Schlageter did nothing more than answer the informal inquiries from Dr. Hall and Dr. Holtsford. Thus, Dr. Schlageter owed no legal duty to Dewell and plaintiff cannot establish her medical negligence claim.

¶ 27    Finally, the sole basis for plaintiff's appeal regarding the jury verdict in favor of Dr. Hall, Dr. Holtsford, and Valley is that plaintiff was denied a fair trial because of the trial court's directed verdict in favor of Dr. Schlageter and Tri City. In her reply brief, plaintiff admits that this argument is foreclosed by the "two issues rule" as stated by our supreme court in *Witherell v. Weimer*, 118 Ill. 2d 321, 329 (1987). Under this rule, "[w]hen there is a general verdict and more than one theory is presented, the verdict will be upheld if there was sufficient evidence to sustain either theory, and [appellant], having failed to request special interrogatories, cannot complain." *Id.* Plaintiff therefore withdraws her appeal against Dr. Hall, Dr. Holtsford, and Valley.

¶ 28                                III. CONCLUSION

¶ 29    For the reasons stated, the judgment of the circuit court of Kane County is affirmed.

¶ 30    Affirmed.