2022 IL App (4th) 220016

NO. 4-22-0016

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 6, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| ELTON LEWIS, Individually and as Independent Administrator of the Estate of Tyrone Lewis, Deceased, Plaintiff-Appellant, v. OSF HEALTHCARE SYSTEM, a Not-for-Profit Illinois Corporation, Individually and d/b/a OSF Medical Group and St. Francis Medical Center; DR. TRICIA TEOH; DR. MATTHEW JAGER; DR. TERRY SMITH; DR. KAVITHA KALVAKURI; DR. JAMES GRAUMLICH; DR. DANIEL MONTEMAYOR; DR. STOSH EICHENNAUER; DR. JOANNA SHEPHERD; DR. ANNIE MARIAL; and DR. BRYAN McVAY, Defendants (Dr. Matthew Jager, Defendant-Appellee). | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Peoria County No. 17L173 Honorable Stephen A. Kouri, Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court, with opinion.
Justices DeArmond and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1        Plaintiff Elton Lewis, individually and as independent administrator of the estate of

Tyrone Lewis, deceased, appeals from a summary judgment entered on September 2, 2021, by the

circuit court of Peoria County in favor of defendant Dr. Matthew Jager in this medical negligence

action. Although this case remains pending as to other defendants, the trial court made a finding

pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), and this appeal ensued.

¶ 2        The only issue on appeal is the nature and extent of Dr. Jager's involvement in

decedent's medical care on August 29, 2014: was Dr. Jager in a doctor-patient relationship with

decedent sufficient to impose a duty? In granting summary judgment for defendant, the trial court found there was no physician-patient relationship between decedent and Dr. Jager and, therefore, no conduct on the part of Dr. Jager proximately causing decedent's death. Plaintiff appeals, arguing that summary judgment was improperly entered because a question of material fact exists as to defendant's responsibilities for the care and treatment of decedent and as to proximate cause.

¶ 3        We reverse and remand.

¶ 4                              I. BACKGROUND

¶ 5        In August 2016, plaintiff filed a multi-count complaint in medical negligence in Cook County against numerous defendants, which was transferred to Peoria County in May 2017. Plaintiff filed a third amended complaint in October 2018, of which counts II (survival) and XII (wrongful death) were directed against defendant, Dr. Jager, regarding his alleged care and treatment of decedent on August 29, 2014. On that date, decedent presented at Heartland Community Health Clinic (Heartland) and was examined by a third-year resident, Dr. Tricia Teoh. Dr. Jager, a teaching physician at Heartland, reviewed Dr. Teoh's examination and treatment recommendations and noted his approval of them in the patient's chart.

¶ 6                         A. Third Amended Complaint

¶ 7                           1. *General Allegations*

¶ 8        Plaintiff alleges that, on August 6, 2014, decedent was admitted to Saint Francis Medical Center (Saint Francis) with difficulty breathing. Decedent was intubated during his hospital admission and was released on August 22. On August 29, decedent presented to Heartland for follow-up care with purported symptoms of respiratory distress and was, according to the third amended complaint, examined, treated, and/or seen by Dr. Teoh, a resident, and Dr. Jager. Following that visit, decedent was allegedly seen by other medical providers on three subsequent

occasions, including a short hospitalization at Saint Francis. On September 27, decedent was transported via ambulance to the emergency room at Saint Francis, where he died later that day.

¶ 9                                    2. *Allegations Against Dr. Jager*

¶ 10        Count II of the third amended complaint asserted a survival claim against Dr. Jager, and count XII asserted a wrongful death claim. Both counts alleged that during the month of August 2014 decedent was under the "medical care, supervision, and treatment" of Dr. Jager and Dr. Teoh. Specifically, plaintiff alleges that Dr. Jager committed one or more of the following wrongful acts or omissions on August 29: (a) failed to treat and provide proper, adequate, and timely medical care, (b) failed to intervene to provide such care, (c) failed to timely diagnose the cause of decedent's respiratory distress, (d) failed to consult with an appropriate specialist, including an ear, nose, and throat doctor, (e) failed to timely and emergently admit decedent to a hospital to diagnose the cause of and treat decedent's respiratory distress, and (f) failed to order an appropriate scope procedure to examine decedent's throat.

¶ 11        The third amended complaint further alleged that, as a direct and proximate result of one of more of Dr. Jager's wrongful acts and omissions, decedent suffered severe injuries, including, but not limited to, a lost chance of survival and/or recovery from decedent's underlying respiratory distress condition and a worsening of decedent's underlying respiratory distress that ultimately led to and caused his death on September 27, 2014.

¶ 12            B. Motion for Summary Judgment and Supporting Evidence

¶ 13                                    1. *Motion for Summary Judgment*

¶ 14        Dr. Jager moved for summary judgment, arguing that he had "no involvement" in decedent's care at Heartland on August 29 and that, on that date, decedent was assigned to a resident physician, Dr. Teoh. The motion argued that Dr. Jager "did not see or interact with

[decedent] at all on August 29, 2014," and that, as a result, "causation cannot be established as a matter of law and summary judgment is warranted."

¶ 15        The following information can be gleaned from the depositions and medical records submitted in support of and in opposition to the motion for summary judgment.

¶ 16                                     2. *Dr. Jager*

¶ 17        Dr. Jager is a doctor of Osteopathic Medicine and board certified in internal medicine. In 2014, he was employed by the University of Illinois College of Medicine and, beginning back in 2011, worked as an attending physician at Heartland where he supervised residents in the care of patients. Dr. Jager explained this role as follows: "[T]he residents go and see the patient and then they come back after seeing the patient and discuss the history and physical exam they obtained. We call that staffing the patient." Dr. Jager continued, "And then from there, we help ensure that their assessment and plan of the patient are correct and help, when needed, to teach, you know, how to order things and finish up the other logistics involved in the patient care."

¶ 18        Dr. Jager testified that the type of supervision he provided differs, depending on the seniority of the resident. "[W]e have to see all first year resident patients regardless." Dr. Jager testified, "the resident sees the patient, they come back and discuss the patient with us, then we go back either with the resident or by ourselves to see the patient and talk to them and examine the patient." Once the resident becomes a senior resident—starting in the resident's second year—"we don't have to see *** all their patients anymore."

¶ 19        Whether Dr. Jager would see a senior resident's patient depended upon several factors, including the complexity of the patient and whether there were multiple medical problems. Dr. Jager explained,

"The only standard when we have to see the patient is if the complexity is high enough that we're going to bill at a higher level. Otherwise, it's *** left up to us as an attending, which would entail like I didn't feel like the history or what they told me was precise or I didn't, you know, get the total story that I was expecting. Or if there was any concern from what they told me, then I would go see the patient to make sure the information or exam was correct."

¶ 20 Dr. Jager had previously seen decedent on August 18, 2014, during decedent's early August admission to Saint Francis Hospital while decedent was in intermediate care following release from ICU. However, Dr. Jager did not treat decedent at that time.

¶ 21 *3. The August 29, 2014, Visit to Heartland*

¶ 22 On August 29, decedent presented at Heartland on follow-up from his Saint Francis discharge and was examined by Dr. Tricia Teoh, a third-year internal medicine resident. Decedent's chief complaint was listed as "hospital follow-up for angioedema." Decedent reported that he still had shortness of breath, but was "improving," and that it "feels like there's a lot of chest congestion." He related he had been "coughing yellow phlegm" which was "unchanged from hospitalization." He further reported he had "completed [a] course of Levaquin for bacteremia."

¶ 23 Dr. Teoh's exam revealed "upper airway sounds," which she described as not significant. Dr. Teoh testified that she did not reach a single diagnosis on August 29, but instead thought decedent was still recovering from the angioedema. She recommended Mucinex and gave decedent a prescription for a nebulizer machine.

¶ 24 According to Dr. Teoh, the normal post-exam process called for her to discuss her exam and findings with Dr. Jager, "and then I would finish the note, and then he signs off on it." However, she had no independent memory of the conversation on August 29 relating to decedent.

¶ 25 Dr. Jager reviewed Dr. Teoh's examination report and checked the box under "Teaching Physician Documentation," as follows: "I was immediately available during this visit. I reviewed the history, exam findings, labs/tests, and medical decision making with resident at time of visit." He further checked the box, "I agree with resident's medical decision making." Dr. Jager testified, "there was nothing concerning about the encounter when she staffed it with me. *** [W]hich is why I didn't choose to see him that day." Dr. Jager continued, "He sounded very stable and expected course. So I wasn't alarmed." Dr. Jager did not see or examine decedent on August 29 and had no direct contact with him.

¶ 26 During his deposition, Dr. Jager was asked the question, "As the—you referred to yourself as the supervising and it's also documented as the teaching, the attending. As the supervising, teaching, and attending, do you have ultimate responsibility for the treatment provided by Dr. Teoh?" He responded, "On that date, yes."

¶ 27 4. *Plaintiff's Response to Motion for Summary Judgment*

¶ 28 Plaintiff's response to the summary judgment relied on the affidavit of Dr. Ira Gurland, the physician who authored plaintiff's section 2-622 medical report. The response argued that Dr. Jager "admitted he was involved" in decedent's care "through his role as the supervising physician" for Dr. Teoh and that Dr. Jager had admitted he had "ultimate responsibility" for the care and treatment provided by Dr. Teoh. According to plaintiff's response, Dr. Jager's "admission completely negates" his claim that he "had no involvement, connection, or responsibility in this matter." This testimony by Dr. Jager, plaintiff argued, was relied upon by Dr. Gurland, who opined that "Dr. Jager was the supervising physician of Dr. Teoh for said visit" and that he "had ultimate responsibility for the care and treatment provided by Dr. Teoh."

¶ 29    Plaintiff further argued that Dr. Gurland's affidavit created a question of fact on the issues of deviation from the standard of care and proximate cause. Dr. Gurland's affidavit stated that decedent presented to Heartland with "respiratory symptoms, complaints and/or distress, including but not limited to shortness of breath, chest congestion and upper airway sounds post-hospitalization (August 6) and admission that included a prolonged intubation."

¶ 30    Dr. Gurland opined that the standard of care required Dr. Jager to (a) treat and provide proper and adequate and/or timely medical care and attention, (b) intervene to provide proper and adequate and/or timely medical care and attention, (c) timely diagnose the cause of decedent's respiratory distress, (d) consult with an appropriate medical specialist, including but not limited to an ear, nose and throat specialist, (e) admit decedent to a hospital for diagnosis, or (f) order or perform a scope procedure of decedent's throat.

¶ 31    He further asserted that Dr. Jager deviated from this standard of care and that, as a direct and proximate result of one of more of Dr. Jager's wrongful acts and omissions, decedent suffered severe injuries, including but not limited to lost chance of survival or recovery from decedent's underlying respiratory distress condition and a worsening of decedent's underlying respiratory distress that ultimately caused his death on September 27, 2014.

¶ 32                    C. Order on Summary Judgment

¶ 33    On September 2, 2021, the trial court granted Dr. Jager's motion for summary judgment, finding that he "had no interaction with" decedent and "no direct role in the care" of decedent and that Dr. Jager "was simply supervising" Dr. Teoh, a resident. Because there were no allegations "in any of the filed complaints" that Dr. Jager negligently supervised Dr. Teoh, the trial court concluded there was no question of material fact and entered judgment in favor of Dr. Jager.

Following the denial of plaintiff's motion to reconsider, the trial court entered a Rule 304(a) finding with respect to the September 2, 2021, order.

¶ 34    This appeal followed.

¶ 35                              II. ANALYSIS

¶ 36                          A. Standard of Review

¶ 37    Summary judgment is properly granted when the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, show that (1) there is no genuine issue of material fact and (2) the moving party is entitled to judgment as a matter of law. *Enbridge Pipeline (Illinois), LLC v. Temple*, 2017 IL App (4th) 150346, ¶ 69; 735 ILCS 5/2-1005(a) (West 2016). The purpose of summary judgment is not to try an issue of fact but to determine whether a genuine issue of material fact exists. *Evans v. Brown*, 399 Ill. App. 3d 238, 243 (2010).

¶ 38    When determining whether a genuine issue of material fact exists, the court must construe all pleadings and attachments strictly against the moving party and liberally in favor of the nonmoving party. *Lucasey v. Plattner*, 2015 IL App (4th) 140512, ¶ 22. A triable issue exists when there is a dispute concerning material facts or when those facts are undisputed but reasonable persons might draw different inferences from those facts. *Messerly v. Boehmke*, 2014 IL App (4th) 130397, ¶ 32. Summary judgment is a drastic means of disposing of litigation and, therefore, should only be allowed when the right of the moving party is clear and free from doubt. *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986). A trial court's ruling on a motion for summary judgment is reviewed *de novo*. *Boehmke*, 2014 IL App (4th) 130397, ¶ 32; *City of Springfield v. Ameren Illinois Co.*, 2018 IL App (4th) 170755, ¶ 21.

¶ 39              B. Attending Physician's Liability for Negligence of Resident

¶ 40    Because the third amended complaint makes several references to "supervision" by Dr. Jager, and because the affidavit of Dr. Gurland states that "Dr. Jager had ultimate responsibility for the care and treatment provided by Dr. Teoh," we open our analysis by addressing any implication that there is some form of liability on the part of Dr. Jager arising out of his role as a supervising physician.

¶ 41                        1. *Negligent Supervision of a Resident*

¶ 42    As the trial court correctly concluded, negligent supervision was not pleaded in any of the complaints. In a cause of action for negligent supervision against a tortfeasor's employer, a plaintiff must establish that (1) the employer had a duty to supervise its employee, (2) the employer negligently supervised its employee, and (3) such negligence proximately caused the plaintiff's injuries. *Mueller v. Community Consolidated School District 54*, 287 Ill. App. 3d 337, 342-43 (1997). In a medical context, some jurisdictions have found that an attending faculty physician who is responsible for the supervision of residents and interns in the delivery of health care services owes patients a duty of reasonable care in supervising the resident physicians. See, *e.g.*, *Rouse v. Pitt County Memorial Hospital, Inc.*, 470 S.E.2d 44, 47 (N.C. 1996). Here, however, no allegations of negligent supervision have been pleaded against Dr. Jager.

¶ 43    Moreover, plaintiff made numerous admissions at a hearing on the motion to reconsider that this case does not involve any claims that Dr. Jager negligently supervised Dr. Teoh. At the hearing on plaintiff's motion for reconsideration, plaintiff's counsel admitted, "This case seems to have turned into some sort of negligent supervision matter. This is not a negligent supervision case." Counsel further explained, "[Dr. Jager] is the supervising physician. That's his job title. There was never any allegation[ ] in our complaint, in our affidavit, or in our 622 [report] that he negligently supervised." Finally, counsel acknowledged that the trial court's September 2

order, to the extent it found there were no allegations that Dr. Jager negligently supervised one of the other defendant doctors, is correct. "That's not in our complaint. It's never been in this case." These concessions are likewise contained within the plaintiff's briefs before this court. We agree with the trial court that negligent supervision is not a theory put at issue by the pleadings in this case.

¶ 44                                    2. *Vicarious Liability for Acts by a Resident*

¶ 45          Likewise, there is no liability alleged under a theory of vicarious liability. We address this point because plaintiff's arguments appear to be centered upon Dr. Jager's answer to a question posed to him by counsel during his deposition. Specifically, Dr, Jager was asked:

> "Q. As the—you referred to yourself as the supervising and it's also documented as the teaching, the attending. As the supervising, teaching, and attending, do you have *ultimate responsibility* for the treatment provided by Dr. Teoh?
>
> A. On that date, yes." (Emphasis added.)

¶ 46          "Ultimate responsibility," however, is a legal conclusion that suggests vicarious liability, such as an employer's liability for an employee's negligence. See, *e.g.*, *Carroll v. Community Health Care Clinic, Inc.*, 2017 IL App (4th) 150847, ¶ 37 (an employer/master can be liable for the torts of an employee/agent that are committed within the scope of the employment). Plaintiff, however, has presented no case standing for the proposition that an attending physician is vicariously liable for the negligence of a resident under his supervision. Absent an employment relationship, the doctrine does not apply. *Palmer v. Miller*, 380 Ill. 256, 259-60 (1942). Thus, we find no basis to impose a duty on Dr. Jager based on a vicarious liability theory.

¶ 47                                    C. Potential Direct Liability of Dr. Jager

- 10 -

¶ 48     The final question we must address is whether Dr. Jager is potentially directly liable to decedent relating to the events of August 29, 2014, on a theory based on his own alleged negligence. Central to that finding is the initial question of whether a doctor-patient relationship exists, from which a duty of care may spring. Although not expressly framing its analysis in terms of physician-patient relationship or duty, the trial court's conclusion that Dr. Jager was not involved in decedent's care and treatment necessarily implies that Dr. Jager owed no duty of care to decedent because no physician-patient relationship was established between them on August 29. The trial court based its ruling on its finding that Dr. Jager had no interaction with decedent, that he played no direct role in decedent's care, and that he simply supervised one of the other defendants, Dr. Teoh.

¶ 49     In a medical negligence action, a plaintiff must prove a duty owed by the defendant physician, a breach of that duty, an injury proximately caused by the breach, and resultant damages. *Lenahan v. University of Chicago*, 348 Ill. App. 3d 155, 163 (2004). A physician's duty is limited to those situations in which a direct physician-patient relationship exists or there is a special relationship, such as when a physician is asked by another physician to provide a service to a patient, conduct laboratory tests, or review test results. *Id.* The physician-patient relationship is a consensual relationship in which the patient knowingly seeks the physician's assistance and in which the physician knowingly accepts the person as a patient. *Bovara v. St. Francis Hospital*, 298 Ill. App. 3d 1025, 1030 (1998).

¶ 50     It is not necessary that the patient and physician have actual contact with each other for a physician-patient relationship to attach. *Lenahan*, 348 Ill. App. 3d at 164. A physician-patient or special relationship may result when a physician is asked by another physician to provide a service to a patient, conduct laboratory tests, or review test results and does so without ever having

- 11 -

contact with the actual patient. *Id.* at 163-64. Such a relationship is further established where the physician takes some affirmative action to participate in the care, evaluation, diagnosis, or treatment of a specific patient. *Id.* at 164. The central inquiry is whether the physician has been asked to provide a specific service for the benefit of a specific patient. *Bovara*, 298 Ill. App. 3d at 1030; *Mackey v. Sarroca*, 2015 IL App (3d) 130219, ¶ 20.

¶ 51    In *Bovara*, the plaintiff was examined by a cardiologist at the hospital where he was being treated for symptoms of heart disease. His treating cardiologist did not review the plaintiff's angiogram results, but as part of the routine hospital procedure, sent the test results to two "cardiac interventionists" for their review. *Bovara*, 298 Ill. App. 3d at 1027. According to the cardiologist, the cardiac interventionists were employed by the hospital and were responsible for reviewing cardiac test results and making the decision regarding surgical intervention or noninterventionist care. The cardiac interventionists, after reviewing the plaintiff's test results and discussing the case with the treating physician, informed the treating cardiologist that the plaintiff was a candidate for surgical intervention. *Id.* The plaintiff underwent an angioplasty procedure and, during the procedure, went into cardiac arrest and was unable to be revived.

¶ 52    On appeal, the court held that a physician-patient relationship existed between the cardiac interventionists and the plaintiff because the interventionists were assigned by the hospital with the task of consulting with the treating physician, they reviewed the plaintiff's angiogram, they were compensated for their services, and they rendered a medical opinion as to whether the plaintiff was a candidate for surgery. *Id.* at 1031. Accordingly, the interventionists were more involved with the plaintiff's treatment than merely reviewing test results. *Id.* at 1032.

¶ 53    In *Lenahan*, a special relationship establishing a duty of care was found to exist even though the defendant physician had never met the plaintiff's decedent. *Lenahan*, 348 Ill. App.

- 12 -

3d at 166. In that case, the decedent was admitted to a hospital where the defendant physician had responsibility for determining which patients were eligible for inclusion in an experimental high-dose chemotherapy program. The defendant physician never personally examined the decedent and made the decision to admit the decedent in the experimental program based entirely upon reviewing test results and consulting with treating physicians. The appellate court held that a physician-patient relationship existed because the defendant undertook an active role in the decedent's care, was compensated for his services rendered for the decedent, reviewed test results, and made treatment determinations. *Id.* at 164-65.

¶ 54　　　　Reaching a different conclusion from *Bovara* and *Lenahan*, the appellate court, in *Weiss v. Rush North Shore Medical Center*, 372 Ill. App. 3d 186 (2007), affirmed the entry of summary judgment in favor of a psychiatrist based on lack of duty. There, the plaintiff was treated in the emergency department by a treating physician for a mental condition. The treating physician contacted the on-call psychiatrist only to arrange for follow-up care for the plaintiff. The physician discussed the plaintiff's condition and the need for follow-up care with the psychiatrist. The discussion was limited to the need for future care, and the treating physician did not seek any advice regarding any actions or treatment currently needed by the plaintiff. *Id.* at 187. The appellate court held that there was no physician-patient relationship established between the plaintiff and the psychiatrist because the psychiatrist did not perform any services for the plaintiff, did not perform any tests, did not analyze any test results, did not direct the physician in treating the plaintiff, did not form any clinical impressions of the plaintiff, and did not render a medical opinion regarding the plaintiff. *Id.* at 189.

¶ 55　　　　Turning to the facts of this case, it simply cannot be said that Dr. Jager was "not involved" in decedent's care and treatment. He reviewed Dr. Teoh's patient history and exam

findings and ultimately signed off on a course of action based on Dr. Teoh's examination and recommendations. Dr. Teoh was, at that time, a third-year medical resident under the supervision of attending physicians at Heartland. The record strongly suggests that Dr. Jager was required to sign off on the resident's treatment plan. As a supervisor, he necessarily would also have had the right to *disapprove* of the resident's plan and to direct or himself initiate a different one. Dr. Jager himself testified that his role was to "help ensure that [the resident's] assessment and plan" were correct and that he could be involved in "finish[ing] up the other logistics involved in the patient care." Plaintiff's position is that Dr. Jager himself should have ensured that the patient was admitted, referred to a specialist, and given appropriate testing. If Dr. Jager had decided that those things should be done, the record gives no reason to doubt that they would have been done.

¶ 56        We find *Bovara* and *Lenahan* instructive, as the physicians there were found to have a relationship with the patient because they were active members of the team providing care. As in *Bovara*, Dr. Teoh was required by the University of Illinois College of Medicine to consult with the attending physician, here Dr. Jager; in the role of attending physician, Dr. Jager had the ultimate authority to direct the care which was to be given to the patient. In that circumstance, Dr. Jager is not just a teacher; he is an attending physician who owes a duty to his patient. Although he was reviewing Dr. Teoh's proposed treatment, Dr. Jager arrived at his own medical judgment about what that course of treatment should be. This creates the requisite physician-patient relationship.

¶ 57        We also find support in *Reynolds v. Decatur Memorial Hospital*, 277 Ill. App. 3d 80, 85 (1996), where the court noted that a physician-patient relationship can arise "where other persons contact the physician on behalf of the patient." Here, Dr. Teoh not only contacted and consulted Dr. Jager concerning her exam findings and recommendations but was required to do so

because of her status as a senior resident. The instant case does not present the situation whereby a doctor gives an informal opinion at the request of a treating physician. *Id.* Dr. Jager, by reviewing and signing-off on the resident report, clearly did more than casually consult.

¶ 58　　　　To be clear, our decision is not based upon negligent supervision, which is not pleaded here. Dr. Jager, as a supervising physician over medical resident Dr. Teoh, retained the authority to direct her care of the patient or to personally provide it himself. Either way, he controlled the course of the patient's treatment. This conclusion is supported, in part, by the "Teaching Physician Documentation," which lists an alternative for when the teaching physician revises the resident's findings and recommendations and, in part, by Dr. Jager's answer to plaintiff's counsel's line of questioning concerning the presence of stridor—"an inspiratory sound that sounds like what we would classify as a wheeze, which is like a whistling-type sounds." Dr. Jager testified, "If a resident ever comes to me with anything that sounds like stridor, then I go see the patient." Dr. Jager appears to have been more than a mere observer of the patient's care; he gave his necessary approval to the course of treatment and was, therefore, a participant in that care.

¶ 59　　　　Finally, the court notes that Dr. Gurland's affidavit, offered in opposition to the summary judgment motion, was vague and at times conclusory. Affidavits submitted in opposition to motions for summary judgment must consist of facts admissible in evidence as opposed to conclusions, and conclusory matters may not be considered in opposition to motions for summary judgment. *Northrop v. Lopatka*, 242 Ill. App. 3d 1, 8 (1993); *O'Rourke v. Oehler*, 187 Ill. App. 3d 572, 585 (1989). However, no motion to strike the affidavit was filed below, and it does not appear that defendant's position below was grounded on the conclusory nature of the affidavit.

¶ 60　　　　Similarly, we address a related point mentioned by both parties—that is, whether plaintiff has presented any evidence that Dr. Jager deviated from the standard of care. In his brief,

defendant states that "no where [*sic*] does Plaintiff explain \*\*\* why based on [decedent's] presentation (as explained to Dr. Jager by Dr. Teoh) did Dr. Jager have a duty to evaluate [decedent]." Whether a deviation from the standard of care occurred, however, is separate and distinct from the issue raised at summary judgment—whether there was a physician-patient relationship sufficient to create a duty to act. Again, defendant did not move to strike Dr. Gurland's medical opinions as conclusory. Had defendant done so, plaintiff may well have tendered additional or supplemental expert opinions to cure any deficiencies. We simply do not know and cannot reach any conclusions on this issue based on the current record. It is well settled that issues not raised in the trial court are forfeited and cannot be raised for the first time on appeal. *Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 456 (2007).

¶ 61                                    III. CONCLUSION

¶ 62          For the reasons stated, we reverse the trial court's judgment and remand for further proceedings.

¶ 63          Reversed and remanded.

*Lewis v. Jager*, 2022 IL App (4th) 220016

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 17-L-173; the Hon. Stephen A. Kouri, Judge, presiding. |
| **Attorneys for Appellant:** | Michael W. Rathsack, of Park Ridge, for appellant. |
| **Attorneys for Appellee:** | Ann C. Barron, of Heyl, Royster, Voelker & Allen, P.C., of Edwardsville, for appellee. |