2023 IL App (4th) 220238

NO. 4-22-0238

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 26, 2023
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| JUDY BLAGDEN, Individually and as Independent Administrator of the Estate of Dennis Blagden, Deceased, Plaintiff-Appellant, v. MATTHEW McMILLIN, M.D.; GRAHAM HOSPITAL ASSOCIATION; KENNETH KROCK, M.D.; and COLEMAN MEDICAL ASSOCIATES, LTD., Defendants, (Kenneth Krock, M.D., and Coleman Medical Associates, Ltd., Defendants-Appellees). | Appeal from the Circuit Court of Fulton County No. 20L13 <br><br> Honorable Thomas B. Ewing, Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court, with opinion.
Presiding Justice DeArmond and Justice Cavanagh concurred in the judgment and opinion.

**OPINION**

¶ 1        Plaintiff Judy Blagden, individually and as independent administrator of the estate

of Dennis Blagden, deceased, appeals from a March 2022 summary judgment order entered by the

circuit court of Fulton County in favor of defendants Dr. Kenneth Krock and Coleman Medical

Associates, Ltd. (Coleman), in this medical negligence action. The trial court found there was no

physician-patient relationship between Dr. Krock and decedent Dennis Blagden and, therefore, no

duty was owed.

¶ 2        This case remains pending in the circuit court as to other defendants but is currently

before this court pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016).

¶ 3        The only issue presented on appeal is whether, as a matter of law, a telephone consultation between the emergency department physician, Dr. McMillin, and on-call physician, Dr. Krock, concerning decedent's medical condition and his possible admission into Graham Hospital created a physician-patient relationship between Dr. Krock and decedent such that a duty of care arose.

¶ 4        For the reasons set forth below, we reverse and remand.

¶ 5                            I. BACKGROUND

¶ 6                            A. The Pleadings

¶ 7        In January 2019, plaintiff filed a single count complaint in Peoria County against defendants Matthew McMillin, M.D., Graham Hospital Association, Graham Hospital Foundation, Inc., and Graham Health System d/b/a Graham Hospital, alleging medical negligence associated with the death of decedent. Plaintiff filed an amended complaint in July of that year; count II of the amended complaint was a medical negligence action directed against defendants Dr. Krock, Coleman, and Graham Hospital Association.

¶ 8        Count II alleged that decedent had presented to Graham Hospital's emergency department with "certain symptoms" and was seen by Dr. McMillin, an agent of Coleman, who "ordered certain laboratory tests." It further alleged that Dr. McMillin consulted with Dr. Krock, who had admitting privileges at Graham Hospital, "to discuss [decedent's] presentation and whether [he] should be admitted to the hospital." It was also alleged that Dr. McMillin "relayed all [decedent's] medical information in his possession and in the records to Dr. Krock." The amended complaint alleged that, at the conclusion of that conversation, "it was decided that [decedent] would not be admitted to Graham Hospital and he was discharged from the emergency

department." It further stated that, at the time of discharge, "infection was still on Dr. Krock's differential diagnosis."

¶ 9        Count II alleged that, on July 29, decedent again presented to the Graham Hospital emergency department; his condition at that time "required LifeFlight transport from Graham Hospital to Methodist Medical Center, where [magnetic resonance imaging (MRI)] revealed a spinal epidural abscess." Decedent passed away on August 7, 2017.

¶ 10        Plaintiff contends that Dr. Krock stood in a physician-patient relationship with decedent that gave rise to a duty of care and that defendants were negligent in one or more of the following ways: (1) failed to rule out an infectious process, (2) failed to admit and monitor decedent, or (3) discharged decedent home when it was not safe to do so.

¶ 11                        B. Transfer to Fulton County

¶ 12        In 2020, the case was transferred from Peoria County to Fulton County on *forum non conveniens* grounds.

¶ 13                        C. Summary Judgment

¶ 14        In July 2021, defendants Dr. Krock and Coleman filed a motion for summary judgment directed against count II of the amended complaint, asserting that there was no physician-patient relationship between Dr. Krock and decedent and that, as a result, Dr. Krock owed no duty of care to decedent.

¶ 15        The following facts were established from the depositions and exhibits filed in connection with the motion for summary judgment papers.

¶ 16                  1. *July 26 Emergency Department Visit*

¶ 17        Decedent presented at Graham Hospital's emergency department at 7:08 p.m. on July 26 with complaints of severe pain to his right posterior neck and trapezius area, a bug bite to

- 3 -

his right elbow, and right elbow swelling. According to hospital records, his symptoms began the night before with a bad headache that involved his neck when he awoke. He was unable to move his head side-to-side or up-and-down, and he reported that movement caused increased pain. His records stated he had a "fever last night—none today" and reported no difficulty breathing. They further indicated he had experienced "some nausea without vomiting—feels this is related to pain." He had no report of injury. The records stated, "[no] current headache—no fever—no light sensitivity—no generalized symptoms."

¶ 18     Dr. McMillin, decedent's attending physician at Graham Hospital, reviewed the nursing records, performed his own physical examination of decedent, and ordered a complete blood count and comprehensive metabolic panel to "help isolate what [he] thought was going on with his care." He later ordered a sedimentation rate test, which is "a very generalized measure of inflammation" which "relates the likelihood of general inflammation in the body." One of Dr. McMillin's early concerns was a possible infection. Dr. McMillin prescribed Toradol (an anti-inflammatory pain medication) and Norflex (a muscle relaxer), which helped somewhat, but decedent continued to have "pain in the area and some muscular spasm that was not relieved by what I had given him to that point."

¶ 19     The test results showed an elevated white blood count, a normal distribution of neutrophils, and a slightly elevated sedimentation rate. When asked to explain his differential diagnosis after reviewing the various test results, Dr. McMillin testified that, as of 8:39 p.m., "the things [he] would worry about would be primarily muscular and to a lesser extent infectious." Dr. McMillin's notes showed he diagnosed decedent with torticollis, a muscular condition of the shoulders and neck.

¶ 20 When asked why he did not, at that point, release decedent to go home, Dr. McMillin said, "I think at that time, given the fact that he was still having some symptoms, I wanted to make sure I consulted with the primary care provider on call to determine what the next appropriate steps would be." He added, "I wanted [him] either admitted to the hospital or arranged for appropriate follow-up," which he clarified would consist of seeing his primary care provider the next day. At that point, Dr. McMillin called the on-call physician, Dr. Krock.

¶ 21 Because Dr. McMillin did not have admitting authority at Graham Hospital, admission orders were required to come from either the patient's primary care provider or the on-call physician. According to Dr. McMillin, "The whole point of calling a physician on call is to discuss hospitalization." Dr. McMillin agreed that, if decedent was going to be hospitalized that evening, it would have been pursuant to the order of Dr. Krock, who had admitting authority at Graham Hospital. However, had Dr. McMillin intended to release a patient, he did not need to consult with any other physician.

¶ 22 *2. The Call to Dr. Krock*

¶ 23 Dr. Krock was the on-call internal medicine physician on the evening of July 26 pursuant to a contractual agreement between Coleman (his employer) and Graham Hospital, whereby Coleman physicians provided on-call services as a part of their employment. At approximately 8:57 p.m., he took a call from emergency department physician Dr. McMillin relating to decedent's condition. Dr. Krock had no memory of the interaction with Dr. McMillin that evening.

¶ 24 Dr. McMillin testified that he discussed all available medical information concerning decedent with Dr. Krock, including the various test results, complaints, and history. He did not recall whether Dr. Krock contributed to the diagnosis of torticollis, but the emergency

- 5 -

department medical records show torticollis as a possible condition prior to Dr. McMillin's call to Dr. Krock.

¶ 25    Dr. McMillin agreed that the topic of decedent's hospitalization came up during his call with Dr. Krock and said that his call "went like every conversation I would have" where "we would go through the entire case and come to a consensus of whether based on all the information available if hospitalization was warranted at the time." Concerning decedent's possible admission, Dr. McMillin was asked the following series of questions:

> "Q. And based on your notes, your records and all this, did you ever consider asking Dr. Krock whether or not he needed to be admitted as a patient?
>
> A. Yes.
>
> Q. And do you believe that you would have discussed with Dr. Krock whether Dr. Krock believed he should be admitted as a patient?
>
> A. Yes.
>
> Q. And is it your belief that Dr. Krock was of the mind that he should not be admitted that evening?
>
> A. Yes."

¶ 26    Dr. Krock could not comment on whether that happened on this occasion but testified that such questions, "happen[ ] pretty regularly." Dr. Krock was asked, if a physician "has a question about whether a patient is to be admitted or not, he has someone to call who is on-call to discuss that with?" He responded, "That's not typically our role, but, yes, sometimes we'll do that." Dr. Krock then explained, "Typically the decision to admit has already been made" by the emergency department physician. Dr. Krock testified that he had a "right of refusal to decline the admission" but noted that he had never done that in all his years of practice. Dr. Krock further

testified that when asked by an emergency department physician about admitting a particular patient, his typical response to the physician is, "you're the one looking at the patient." He added, "You tell me what you want to do with the patient."

¶ 27 Both physicians agreed that whether to admit decedent "was a collaborative decision," but both acknowledged that the decision was ultimately Dr. Krock's. Dr. Krock elaborated, "it's a collaborative decision. We work together, talk together, figure out what is best for the patient."

¶ 28 Following the discussion between Dr. Krock and Dr. McMillin, decedent was released from Graham Hospital with instructions to follow up with his personal physician the next day; he was also told to return to the emergency department if his symptoms worsened or he developed signs of illness. At that point, infection had not been excluded from the differential diagnosis, but as Dr. McMillin explained, "[i]t was just not the most likely diagnosis at that time and needed closer follow-up." Dr. McMillin recalled telling decedent and his wife upon discharge, "I didn't know exactly what was going on, this was the most likely diagnosis, but that I could not exclude 100 percent there was some other process going on, and it needed immediate follow-up." He added, "I suggested [decedent] needed follow-up just so he could be evaluated by his primary care provider to assess whether things have changed, and he could make the determination if [decedent] needed further intervention."

¶ 29 3. *July 29 Emergency Department Visit*

¶ 30 Decedent did not follow up with his personal physician and instead returned to the Graham Hospital emergency department on July 29 with hypercapnic respiratory failure, sepsis, and an altered mental state. He was intubated by Dr. McMillin and transferred by LifeFlight

- 7 -

services to Methodist Medical Center in Peoria, Illinois. Following an MRI at that facility, he was diagnosed with a spinal epidural abscess. He died on August 7.

¶ 31                                   D. Circuit Court Disposition

¶ 32        At the conclusion of the arguments on defendants' motion for summary judgment, the court stated in open court, "I'm going to find that the motion should be granted." He said, "There was no direction here, there was just confirmation, and I think that's an important distinction ***."

¶ 33        On March 2, 2022, the circuit court entered a written order granting defendants' motion for summary judgment for the reasons set forth on the record at the summary judgment hearing and further found, pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), that "there is no just reason for delaying enforcement and appeal" of the court's order granting summary judgment.

¶ 34        This appeal followed.

¶ 35                                   II. ANALYSIS

¶ 36        The singular question before this court is whether the circuit court properly granted defendants' motion for summary judgment as to count II of the amended complaint based upon the court's finding that Dr. Krock owed no duty of professional care to decedent. Central to that question is whether Dr. Krock stood in a physician-patient relationship with decedent because of the phone call between him and the emergency department physician, Dr. McMillin.

¶ 37                                   A. Standard of Review

¶ 38        Summary judgment is properly granted when the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, show that (1) there is no genuine issue of material fact and (2) the moving party is entitled to

judgment as a matter of law. *Lewis v. OSF Healthcare System*, 2022 IL App (4th) 220016, ¶ 37 (citing *Enbridge Pipeline (Illinois), LLC v. Temple*, 2017 IL App (4th) 150346, ¶ 69, and 735 ILCS 5/2-1005(c) (West 2016)). The purpose of summary judgment is not to try an issue of fact but to determine whether a genuine issue of material fact exists. *Evans v. Brown*, 399 Ill. App. 3d 238, 243 (2010).

¶ 39　　　　When determining whether a genuine issue of material fact exists, the court must construe all pleadings and attachments strictly against the moving party and liberally in favor of the nonmoving party. *Lucasey v. Plattner*, 2015 IL App (4th) 140512, ¶ 22. A triable issue exists when there is a dispute concerning material facts or when those facts are undisputed but reasonable persons might draw different inferences from them. *Messerly v. Boehmke*, 2014 IL App (4th) 130397, ¶ 32. Summary judgment is a drastic means of disposing of litigation and, therefore, should only be allowed when the right of the moving party is clear and free from doubt. *Lewis*, 2022 IL App (4th) 220016, ¶ 38 (citing *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986)). Whether a duty of care exists is a question of law to be determined by the court and thus may be determined on a motion for summary judgment. *Wojdyla v. City of Park Ridge*, 148 Ill. 2d 417, 421 (1992).

¶ 40　　　　A trial court's ruling on a motion for summary judgment is reviewed *de novo*. *Boehmke*, 2014 IL App (4th) 130397, ¶ 32; *City of Springfield v. Ameren Illinois Co.*, 2018 IL App (4th) 170755, ¶ 21. " 'The term "*de novo*" means that the court reviews the matter anew—the same as if the case had not been heard before and as if no decision had been rendered previously.' " *Freeburg Community Consolidated School District No. 70 v. Country Mutual Insurance Co.*, 2021 IL App (5th) 190098, ¶ 80 (quoting *Ryan v. Yarbrough*, 355 Ill. App. 3d 342, 346 (2005)). "Where, as here, the issues are all reviewed *de novo*, ' "we perform the same analysis a trial court would perform and give no deference to the judge's conclusions or specific rationale." ' " *Id.* (quoting

*Hassebrock v. Ceja Corp.*, 2015 IL App (5th) 140037, ¶ 79, quoting *Bituminous Casualty Corp. v. Iles*, 2013 IL App (5th) 120485, ¶ 19).

¶ 41                                    B. A Physician's Duty of Care

¶ 42        In a medical negligence action, a plaintiff must prove a duty owed by the defendant physician to the plaintiff, a breach of that duty, an injury proximately caused by the breach, and resultant damages. *Lewis*, 2022 IL App (4th) 220016, ¶ 49 (citing *Lenahan v. University of Chicago*, 348 Ill. App. 3d 155, 163 (2004)). A physician's duty arises only when a physician-patient relationship has been expressly established or there is a special relationship such as when one physician is asked by another physician to provide a service to the patient, conduct laboratory tests, or review test results. *Siwa v. Koch*, 388 Ill. App. 3d 444, 447 (2009); *Weiss v. Rush North Shore Medical Center*, 372 Ill. App. 3d 186, 188 (2007); *Reynolds v. Decatur Memorial Hospital*, 277 Ill. App. 3d 80, 85 (1996). In this case, our question is whether a special relationship existed between Dr. Krock and decedent that gave rise to a physician-patient relationship and imposed a professional duty of care upon Dr. Krock.

¶ 43        Illinois law is well settled that the special relationship giving rise to a duty of care may exist even in the absence of any meeting between the physician and the patient where the physician performs specific services for the benefit of the patient. *Mackey v. Sarroca*, 2015 IL App (3d) 130219, ¶ 20 (citing *Weiss*, 372 Ill. App. 3d at 189, and *Bovara v. St. Francis Hospital*, 298 Ill. App. 3d 1025, 1026-27 (1998)). A physician-patient relationship is established "where the physician takes some affirmative action to participate in the care, evaluation, diagnosis or treatment of a specific patient." *Id.* (citing *Lenahan*, 348 Ill. App. 3d at 164). "The central inquiry is whether the physician has been asked to provide a specific service for the benefit of a specific patient" (*id.*), such as conducting laboratory tests, reviewing the patient's test results, directing the

treating physicians in their care of the patient, or otherwise knowingly accepting the patient as his or her patient. *Reynolds*, 277 Ill. App. 3d at 85. Merely dispensing medical advice or offering a professional opinion in response to an inquiry from the patient's treating physicians is not sufficient to create a duty. See *Estate of Kundert v. Illinois Valley Community Hospital*, 2012 IL App (3d) 110007, ¶ 28.

¶ 44                                    C. Case Law Involving On-Call Physicians

¶ 45        This is not the first case to consider whether a physician-patient relationship is established when an on-call physician participates in a telephone conference with another physician about the proper management of a patient's care. The analysis is often fact specific. Consequently, we examine existing case law in this area for guidance.

¶ 46                                    1. *Cases Finding a Physician-Patient Relationship*

¶ 47        In *Mackey*, 2015 IL App (3d) 130219, the plaintiffs filed a medical negligence action asserting that Michelle Mackey, who was seen in the emergency department for a variety of complaints, suffered from sepsis and was misdiagnosed. The emergency department physician, Dr. Sarroca, telephoned Dr. DeFranco, the on-call urologist, and related Michelle's history and complaints, exam findings, test results, and medications. At the conclusion of their discussion, Dr. DeFranco instructed the emergency department physician that Michelle should be given Flomax to help pass the stone and she should see him in his office the following Monday. Michelle was discharged from the emergency department but subsequently developed a severe case of septic shock as well as severe respiratory and renal failure. The plaintiff subsequently filed a medical negligence action against Dr. DeFranco, but the circuit court dismissed the claim because it concluded that no physician-patient relationship existed, and no duty was owed.

¶ 48    On appeal, the court concluded that the well-pleaded facts "establish[ed] that Dr. DeFranco's relationship with Michelle was more akin to those physicians found to have a special relationship giving rise to a professional duty of care." *Id.* ¶ 27. The court explained:

"Specifically, the complaint established that Dr. DeFranco: (1) was the on-call urologist assigned to consult with treating physicians at Silver Cross Hospital pursuant to a contract between the hospital and his employer; (2) was compensated for his consulting services; (3) was consulted by the emergency room physician for Michelle's benefit for the specific purpose of rendering diagnostic and medical advice regarding her treatment; (4) received specific information regarding her history, symptoms, and diagnostic test results; (5) evaluated those tests results and formed a medical opinion that she was not in danger of sepsis; (6) was actually responsible for making decision[s] regarding her care and whether she was to be admitted or released; and (7) decided that Michelle did not need to be admitted but could be discharged with an instruction to seek an out-patient follow-up appointment on Monday." *Id.*

¶ 49    The court stated,

"Our review of the case law leads a conclusion that a special relationship establishing a physician-patient relationship exists where *** the consulting physician is assigned the task of consulting as part of established procedures, protocols or contractual obligation with the hospital, is compensated for those consulting services, orders tests or reviews test results, gives specific medical advice regarding contemporaneous patient care, and makes decisions regarding the

- 12 -

patient's current medical care." *Id.* ¶ 26 (citing *Bovara*, 298 Ill. App. 3d at 1032, and *Lenahan*, 348 Ill. App. 3d at 164-65).

¶ 50        Accordingly, the appellate court reversed and remanded. *Id*., ¶ 27.

¶ 51        Another case which examined the duty owed by an on-call physician was *Bovara*, 298 Ill. App. 3d 1025. There, tests were administered at the hospital to the plaintiff-patient, and the results were sent to two cardiac interventionists for review. The cardiac interventionists were employed by the hospital and were responsible for reviewing cardiac test results and making the decision regarding surgical intervention or noninterventionist care. After reviewing the plaintiff's test results and discussing the case with the treating physician, the cardiac interventionists informed the treating cardiologist that the plaintiff was a candidate for surgical intervention. The plaintiff underwent an angioplasty procedure during which he went into cardiac arrest and died. The circuit court entered summary judgment for the defendant, finding no physician-patient relationship.

¶ 52        On appeal, the court reversed and held that there were genuine issues of material facts as to whether a physician-patient relationship existed between the cardiac interventionists and the plaintiff. *Bovara*, 298 Ill. App. 3d at 1033. The court reasoned that the cardiac interventionists were assigned by the hospital with the task of consulting with the treating physician, they reviewed the plaintiff's angiogram, were compensated for their services, and rendered a medical opinion as to whether the plaintiff was a candidate for surgery. *Id.* at 1031. Additionally, the court found that the interventionists were more involved with the plaintiff's treatment than merely reviewing test results. *Id.* at 1032.

¶ 53        Similarly, in *Lenahan*, the decedent was admitted to a hospital where the defendant physician had responsibility for determining which patients were eligible for inclusion in an

experimental high-dose chemotherapy program. The defendant physician never personally examined the decedent and made the decision to admit the decedent in the experimental program based entirely upon reviewing test results and consulting with treating physicians. The appellate court held that a physician-patient relationship existed because the defendant had an active role in the decedent's care, was compensated for his services rendered for the plaintiff, reviewed test results, and made treatment determinations. *Lenahan*, 348 Ill. App. 3d at 164-65.

¶ 54                    2. *Cases Finding No Physician-Patient Relationship*

¶ 55          In *Reynolds*, 277 Ill. App. 3d 80, a case cited by defendants and relied upon by the circuit court, the plaintiffs' son, Kevin, was admitted to the hospital and Dr. Bonds, a pediatrician, was asked to evaluate him. After examining the patient, Dr. Bonds called Dr. Fulbright, a neurologist, at his home and relayed the minor's condition and the test results. At the conclusion of the conversation, Dr. Fulbright suggested "a spinal tap to determine whether meningitis, encephalitis, or something similar was involved." *Id.* at 82. According to the testimony, "Kevin's family never asked [Dr.] Fulbright to treat Kevin, and he never saw, examined, or came to a diagnosis as to Kevin's condition." *Id.* at 83. Moreover, "[Dr.] Fulbright did not bill for any services to Kevin." *Id.* Dr. Bond ultimately diagnosed Kevin with an infectious process. The next day, however, Kevin was transferred to St. John's Hospital and was diagnosed with a spinal cord injury.

¶ 56          When Kevin's parents later filed a medical negligence action, the circuit court granted summary judgment in favor of Dr. Fulbright on the basis that there was no physician-patient relationship with Kevin. In affirming the summary judgment, the appellate court stated that, although

"[a] consensual relationship can exist where other persons contact the physician on behalf of the patient, *** this is not a case in which [Dr.] Fulbright was asked to provide a service for Kevin, conduct laboratory tests, or review test results. Fulbright did nothing more than answer an inquiry from a colleague. He was not contacted again and he charged no fee." *Id.* at 85.

Dr. Fulbright "often received informal inquiries from other doctors asking questions and seeking suggestions" without "a request to see a patient, review a patient, or render an opinion, but only to discuss the case." *Id.* at 83. Dr. Fulbright "considered this a courtesy service for which he did not bill." *Id.* According to the appellate court, "A doctor who gives an informal opinion at the request of a treating physician does not owe a duty of care to the patient whose case was discussed." *Id.* at 85. The court further noted that the case before it was not one in which Dr. Fulbright "had accepted a referral of the patient" nor was it "a case in which a physician undertook to direct the actions of hospital employees in a telephone conversation with an emergency room nurse." *Id.* For these reasons, the appellate court in *Reynolds* affirmed the circuit court's entry of summary judgment.

¶ 57       In *Weiss*, 372 Ill. App. 3d 186, the plaintiff was seen for a mental health issue in the emergency department. The treating physician contacted the on-call psychiatrist solely to arrange for the plaintiff's follow-up care. Although the physician discussed the plaintiff's condition and the need for follow-up care with the on-call psychiatrist, the discussion was limited to the need for future care; the treating physician did not seek any advice regarding any treatment currently needed by the plaintiff. The appellate court held that there was no physician-patient relationship between the plaintiff and the psychiatrist because the psychiatrist did not perform any services for the plaintiff, did not perform any tests, did not analyze any test results, did not direct

the physician in treating the plaintiff, did not form any clinical impressions of the plaintiff, and did not render a medical opinion regarding the plaintiff. *Id.* at 189.

¶ 58        Similarly, in *Gillespie v. University of Chicago Hospitals*, 387 Ill. App. 3d 540 (2008), a medical negligence action arising out of the patient's death was brought against several healthcare providers, including Dr. Vashi, an on-call internist. The trial court directed a verdict in Dr. Vashi's favor on the basis that no physician-patient relationship existed. The appellate court affirmed, holding that Dr. Vashi was not involved in the decedent's treatment or care because her "role of interpreting the EKG and reviewing any other test results came only after [the decedent] was discharged and her report was not used to diagnose or treat [her]" and was based on "the same results that the emergency room doctors had available to them when [the decedent] was in the emergency room." *Id.* at 546.

¶ 59                D. Application of the Foregoing Principles Here

¶ 60        Based on the undisputed facts, we conclude that *Mackey*, *Bovara*, and *Lenahan* are more analogous to our case and that it was error for the circuit court to enter summary judgment on count II of the amended complaint. Specifically, the undisputed facts establish that Dr. Krock (1) was the on-call physician assigned to consult with emergency department physicians at Graham Hospital pursuant to a contract between the hospital and his employer; (2) was compensated for his on-call consulting services; (3) was consulted by the emergency department physician for decedent's benefit for the specific purpose of rendering medical advice regarding his possible hospital admission; (4) received specific information from the emergency department physician regarding decedent's history, symptoms, and diagnostic test results; (5) considered those tests results and collaborated on a medical opinion that decedent was not in immediate danger of infection; (6) was ultimately responsible for making decision regarding whether decedent was to

- 16 -

be admitted; and (7) decided that decedent did not need to be admitted but could be discharged with an instruction to seek an outpatient follow-up appointment with his personal physician.

¶ 61        Of these facts, two stand out as having special significance. First, pursuant to Graham Hospital's protocols, Dr. Krock had admitting privileges but Dr. McMillin, as an emergency department physician, did not. Thus, an integral part of Dr. Krock's job was to assess—either himself or in cooperation with the emergency department physician—whether a patient should be admitted. Indeed, this is precisely why Dr. Krock was consulted in the first instance. Dr. McMillin contacted Dr. Krock for the specific purpose of obtaining his opinion concerning decedent's admission or discharge. According to Dr. McMillin, "The whole point of calling a physician on call is to discuss hospitalization." Dr. McMillin agreed that, if decedent was going to be hospitalized that evening, it would have been by Dr. Krock, who had admitting authority at Graham Hospital. Had Dr. McMillin intended to simply release decedent, he did not need to consult with any other physician. This testimony makes it clear that Dr. McMillin called Dr. Krock to seek his advice concerning whether decedent needed to be admitted. At a minimum, he wanted a professional assessment as to whether discharge with instructions to follow-up was a proper course of action.

¶ 62        Second, although there was testimony from both physicians that the decision whether to admit had collaborative aspects, admission to the hospital was ultimately Dr. Krock's to make. Dr. McMillin agreed that decedent's hospitalization was discussed during his call with Dr. Krock and that the call "went like every conversation I would have" where "we would go through the entire case and come to a consensus of whether based on all the information available if hospitalization was warranted at the time." Dr. Krock could not recall the conversation, but he acknowledged that his role as on-call physician occasionally was to discuss whether to admit. As

Dr. Krock explained, "it's a collaborative decision. We work together, talk together, figure out what is best for the patient."

¶ 63    These undisputed facts satisfy *Mackey*'s central inquiry test and justify the imposition of the physician-patient relationship and its associated duty of care. The facts here more closely resemble those of *Mackey*, *Bovara*, and *Lenahan*, where the physicians in question provided a specific service to the plaintiff or decedent and were involved in the patient's medical care and treatment decisions. Additionally, the physicians in each case were under some type of contractual relationship with the emergency department facility.

¶ 64    We note that the circuit court declined to follow *Mackey* because it concluded there was "no direction here, there was just confirmation." However, that distinction is not the only conclusion supported by the uncontested facts, as Dr. Krock was asked for his view in connection with the decision whether to admit the patient—a matter which only he had the authority to decide. In this respect, Dr. Krock was asked to provide "a specific service for the benefit of a specific patient."

¶ 65    We also conclude that *Reynolds*, which found no physician-patient relationship, is factually distinguishable from this case. The consulting physician in *Reynolds* recommended a test but was not responsible for any portion of the patient's diagnosis or treatment. Moreover, he did not stand in any contractual relationship with the emergency department's hospital, he received no compensation, and he was contacted on a much more informal basis. The same cannot be said of Dr. Krock, who was contractually obligated to serve as an on-call physician, consulted and collaborated with the emergency department physician concerning the decision to admit or discharge, and had the ultimate authority to admit.

¶ 66　　　　The same is true concerning *Weiss* and *Gillespie*. Neither physician participated in the patient's medical care or treatment. Although the physicians in both cases were under contract with the defendant hospitals, neither physician played any role in the treatment or care rendered prior to the patient's discharge; one physician was consulted solely to arrange follow-up psychiatric care after discharge and the other physician's report came after the patient's discharge and was not used to treat or diagnose.

¶ 67　　　　In *Lewis*, 2022 IL App (4th) 220016, ¶¶ 56-58, we recently held that a supervising physician with final authority over the patient's medical care provided by a third-year medical intern stood in a physician-patient relationship with the patient. Factually, *Lewis* is dissimilar to this case, as the physician's role was supervisory rather than consultative. Despite that difference, however, there are principles seen in *Lewis* that are in harmony with our decision here. In both cases, the physician-patient relationship arose from the defendant physicians' direct involvement in decisions concerning the patient's care—decisions which belonged to them alone pursuant to hospital policies.

¶ 68　　　　　　　　　　　E. Public Policy Concerns

¶ 69　　　　Both parties have raised public policies arguments respecting our potential ruling, with defendants and the circuit court relying heavily on the following passage from *Reynolds*:

> "Plaintiffs suggest that what needs to be done is to find a physician-patient relationship to result from every such conversation. The consequence of such a rule would be significant. It would have a chilling effect upon practice of medicine. It would stifle communication, education and professional association, all to the detriment of the patient. The likely effect in adopting plaintiff's argument also would be that such informal conferences would no longer occur. To reiterate, this

would inhibit the exchange of information and expertise among physicians and would not benefit the medical profession or persons seeking treatment." *Reynolds*, 277 Ill. App. 3d at 86-87 (citing *Lopez v. Aziz*, 852 S.W.2d 303, 307 (Tex. Ct. App. 1993)).

¶ 70    We agree that these observations from *Reynolds* are important, but unlike defendants, we find that they support the finding of a physician-patient relationship here. The discussion between Dr. McMillin and Dr. Krock was not an "informal conference" of the type noted in *Reynolds*. It was a conference that was contemplated by hospital bylaws because Dr. McMillin was unsure of whether to admit the patient, and the sole authority to decide whether to admit rested with Dr. Krock. The physician-patient relationship between Dr. Krock and the decedent arises from a contractual obligation requiring him, as the on-call consulting physician, to make admission decisions for compensation. While public policy should encourage informal consultations between physicians, it must not ignore actual physician involvement in decisions that directly affect a patient's care.

¶ 71                                    III. CONCLUSION

¶ 72    For the reasons stated, we reverse the trial court's summary judgment and remand this case for further proceedings.

¶ 73    Reversed and remanded.

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Fulton County, No. 20-L-13; the Hon. Thomas B. Ewing, Judge, presiding. |
| **Attorneys for Appellant:** | Matthew D. Ports and Alexander J. Marsh, of Pfaff, Gill & Ports, Ltd., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Adrian E. Harless, of Heyl, Royster, Voelker & Allen, P.C., of Springfield, and Karen Kies DeGrand and Jeffrey E. Eippart, of Donohue Brown Mathewson & Smyth LLC, of Chicago, for appellees. |